**Joseph B. Fiorenzo, Esq.**
**David L. Cook, Esq.**
**Michael J. Sullivan, Esq.**
**SILLS CUMMIS & GROSS P.C.**
**One Riverfront Plaza**
**Newark, New Jersey 07102**
**Tel. (973) 643-7000**
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ONE JOURNAL SQUARE PARTNERS URBAN RENEWAL COMPANY LLC, ONE JOURNAL SQUARE TOWER NORTH URBAN RENEWAL COMPANY LLC, and ONE JOURNAL SQUARE TOWER SOUTH URBAN RENEWAL COMPANY LLC,** : : : : | **Civil Action No.** <br><br> **COMPLAINT AND JURY DEMAND** |
| **Plaintiffs,** : | |
| **v.** : | |
| **JERSEY CITY REDEVELOPMENT AGENCY, CITY OF JERSEY CITY, and STEVEN FULOP** : : | |
| **Defendants.** : | |

Plaintiffs, One Journal Square Partners Urban Renewal Company LLC, One Journal Square Tower North Urban Renewal Company LLC, and One Journal Square Tower South Urban Renewal Company LLC (collectively, "JSP" or "Plaintiffs"), for their Complaint against Defendants the Jersey City Redevelopment Agency (the "JCRA"), the City of Jersey City (the "City"), and Steven Fulop ("Fulop," and collectively, "Defendants")), allege and state as follows:

## SUMMARY OF ACTION

1.     JSP is the owner of certain property located at One Journal Square in Jersey City, New Jersey, upon which JSP has received approval to construct two 56-story residential towers containing 1,512 residential units above a ten-story podium containing approximately 96,000 square feet of retail space, 118,000 square feet of commercial space, amenities for residents of the towers, a landscaped plaza with an estimated cost of $10.6 million and an 864-space parking garage (the "Project" or "Project Premises").  The Project has an estimated cost of approximately $900 million and is intended to transform and revitalize the blighted Journal Square area of Jersey City, which has been designated as an area in need of redevelopment by the City.  For over three years, JSP has worked diligently to perform its obligations under certain agreements with the JCRA and the City, including the Redevelopment Agreement effective as of April 21, 2015 (the "Redevelopment Agreement").  In doing so, JSP has spent approximately $55 million in application and development costs.  Despite this, Defendants caused to be issued on April 17, 2018 a letter falsely claiming that Plaintiffs had defaulted in their obligations under the Redevelopment Agreement (the "Notice of Default").  The issuance of the Notice of Default was motivated solely by political animus towards Plaintiffs due to the fact that one of the principal investors in JSP is the Kushner Companies LLC ("Kushner Companies"), which was formerly run by Jared Kushner, currently a senior advisor to President Donald J. Trump.  The Notice of Default was issued to appease and curry favor with the overwhelmingly anti-Trump constituents of Jersey City.

2.     JSP brings this action against Defendants for violation of its constitutional rights, breach of contract, breach of the covenant of good faith and fair dealing, and for various other legal and equitable relief as a result of Defendants' unlawful Notice of Default, which represents a repudiation of the long course of dealing between the parties, is contrary to the contractual

2

obligations of Defendants under the Redevelopment Agreement, is motivated purely by political animus towards President Trump, and constitutes little more than a transparent and illegal attempt to deprive Plaintiffs of their property rights under color of law, in violation of 42 U.S.C. § 1983.

## THE PARTIES

3.     Plaintiff One Journal Square Partners Urban Renewal Company LLC is a New Jersey limited liability company with its principal place of business located at 100 Challenger Road, Suite 401, Ridgefield Park, New Jersey.  One Journal Square Partners Urban Renewal Company LLC conducts business in this district, and the real property that is the subject of this dispute is located in this judicial district.

4.     Plaintiff One Journal Square Tower North Urban Renewal Company LLC is a New Jersey limited liability company with its principal place of business located at 100 Challenger Road, Suite 401, Ridgefield Park, New Jersey.  One Journal Square Tower North Urban Renewal Company LLC conducts business in this judicial district.

5.     Plaintiff One Journal Square Tower South Urban Renewal Company LLC is a New Jersey limited liability company with its principal place of business located at 100 Challenger Road, Suite 401, Ridgefield Park, New Jersey.  One Journal Square Tower South Urban Renewal Company LLC conducts business in this judicial district.

6.     Defendant JCRA is an agency and instrumentality of the City and is located in this judicial district.  The JCRA is controlled by Fulop, the mayor of the City, who directs its actions.   The JCRA Board of Directors and Officers (the "Board") consists of seven commissioners and is led by a chairman and vice chair.  The chairman has at all relevant times been Rolando Lavarro, who also serves as president of the City Council.  Lavarro has long been

a close ally of Fulop and the two ran on the same ticket in the 2013 and 2017 Jersey City elections.  Daniel Rivera is a commissioner on the Board, and another City councilman who ran on the same ticket as Fulop and Lavarro in 2013 and 2017.  The five remaining commissioners of the JCRA were all appointed by Fulop.  The acting executive director of the JCRA is Diane Jeffrey, a close Fulop confidant, who has also served as assistant corporation counsel to the City since the summer of 2013, when Fulop was elected mayor.  As noted in the Redevelopment Agreement, the JCRA is a mere "instrumentality" of the City, and is directed and controlled by Fulop.

7.      Defendant City is a municipal corporation, incorporated as a body politic in Hudson County.  Fulop was elected mayor of the City on May 14, 2013, and assumed office on July 1, 2013.  Fulop and members of the City Council are all members of the Democratic Party. The residents of the City are predominantly aligned with the Democratic Party, as evidenced by the 2017 presidential election in which 82.7% of City voters voted for Hillary Clinton and 14.2% voted for President Trump.

8.      Defendant Fulop is a resident of the City.  Prior to being elected mayor in 2013, he served for eight years as a City councilman.  Plaintiffs plead against Fulop in his personal, as well as his official, capacity.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 on the basis of federal question jurisdiction, as Plaintiffs allege causes of action under 42 U.S.C. § 1983 and the United States Constitution.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Fulop because he resides and works in this judicial district.  This Court has personal jurisdiction over the City because it is a

municipality situated within this judicial district.  This Court has personal jurisdiction over the JCRA because it is an agency that conducts business and affects development and commerce, presently and at all relevant times herein, in this judicial district, and has a primary place of business in this judicial district.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), among other provisions, because the redevelopment project at issue in this Complaint is being performed on property that is located in this judicial district.  Additionally, a substantial part of the actions and events giving rise to the claim occurred in this judicial district.

## ALLEGATIONS AS TO ALL COUNTS

### A.     Background

12.     In 1974, the City Council adopted the Journal Square Redevelopment Plan ("Original Redevelopment Plan"), a comprehensive plan to redevelop the Journal Square area of the City.  As reflected in Original Redevelopment Plan, Journal Square has been designated as an "area in need of rehabilitation" for approximately fifty years.  The area that was the subject of the Original Redevelopment Plan included Journal Square, the PATH rail station and bus depot, and the surrounding neighborhoods within walking distance.  The area was comprised of approximately 211 acres, 57 city blocks, and approximately 1,600 individual parcels.  The Project Premises constitutes the centerpiece of the Original Redevelopment Plan.  In order to move forward with the redevelopment of the Project Premises, the City, through its instrumentality the JCRA, selected Journal Square Development, LLC (the "First Designated Redeveloper") on March 7, 2006 as the designated redeveloper for the Project Premises.

13.     On April 13, 2007, the JCRA consented to an assignment of the First Designated Redeveloper's interest as the designated redeveloper of the Project Premises to a new developer,

namely, MEPT Journal Square Urban Renewal, LLC and related entities (the "Prior Redeveloper" or "MEPT"), which became the new redeveloper of Project Premises.

14.     On April 17, 2007, MEPT and the JCRA entered into an Amended and Restated Redevelopment Agreement (the "Prior Redevelopment Agreement").

15.     On or about November 25, 2008, the City adopted Resolution No. 08-879, in which the City, among other things, again designated the Project Premises as an "area in need of rehabilitation," thus reaffirming  the same designation made in the 1970s.

16.     In 2010, the City Council revised the Original Redevelopment Plan.  On August 25, 2010, the City adopted Ordinance No. 10-103, which approved the Journal Square 2060 Redevelopment Plan (the "2060 Redevelopment Plan").  The stated objectives of the 2060 Redevelopment Plan include, among other things, re-establishing Journal Square as the City's "primary central business district and activity center" with the Project as its centerpiece, in order to ensure vibrant development in areas of the City other than the Hudson River waterfront.

17.     Given the size and complexity of the plan to redevelop the Journal Square area, the City created an office of tax abatement to award the tax abatements necessary to incentivize and attract developers and investment capital to the area.  Indeed, MEPT was awarded a thirty-year tax abatement by the City for the Project.  That award was consistent with actions taken by the City with respect to virtually every major development project in the City over the last decade.

18.     The size, complexity, and cost of the Project was reflected in the Prior Redevelopment Agreement, which contemplated that not only would conventional financing be used for the project, but so would governmental and quasi-governmental financing through tax abatements and other programs to make the Project economically viable.  A fundamental premise

to the successful development of the Project was the cooperation of Defendants in obtaining such governmental and quasi-governmental financing.

19.     Following execution of the Prior Redevelopment Agreement, the Prior Redeveloper was required under the contract to engage in a number of activities, including the following: (a) obtaining various governmental approvals necessary for completion of the Project; (b) obtaining, with governmental assistance, tax abatements for the Project; (c) obtaining a commitment for the financing necessary to construct the Project; and (d) building the Project.

20.     Subsequent to the execution of the Prior Redevelopment Agreement, the Prior Redeveloper engaged in substantial activities to perform its obligations under the parties' agreement.  However, MEPT's reasonable efforts to develop the Project were obstructed and thwarted by the JCRA.

**B.     Plaintiff Is Designated as the New Redeveloper of the Project**

21.     Defendants issued a notice of default to MEPT claiming that it was in breach of the Prior Redevelopment Agreement and that MEPT no longer had any rights in the Project.

22.     As a result of the disputes between MEPT and Defendants, MEPT entered into a Purchase and Sale Agreement with JSP for JSP to purchase MEPT's interest in the Project on February 14, 2014.

23.     At that time, Defendants supported the transfer of the Project from MEPT to JSP, with full knowledge that the Kushner Companies were a principal in JSP and that, at the time, Jared Kushner was CEO of the Kushner Companies.

24.     On May 20, 2014, Defendants consented to the assignment and transfer of the Project from MEPT to JSP, and JSP was at that time deemed the designated redeveloper of the Project.  The result of this assignment and designation of JSP as redeveloper prompted the negotiation of the Redevelopment Agreement between JSP and the JCRA.

25.    During the negotiations, in order to induce JSP to execute the Redevelopment Agreement, Defendants made numerous statements and representations to JSP, including, but not limited to, the following:

A.    That, given the complexity of the Project and the number of issues and problems that could occur in the course of development, Defendants would work in good faith with JSP to adjust the timetable for completion of construction in a reasonable way;

B.    That Defendants would cooperate with and assist JSP in obtaining required Governmental Approvals;

C.    That Defendants would cooperate with and assist JSP in obtaining financing for the Project;

D.    That the Project was in substance a public/private venture and it required cooperation by both sides to achieve the goal of constructing the massive improvements contemplated to revitalize the Journal Square area;

E.    That the Project had received, and the City had issued, tax abatements to the Prior Redeveloper and for other projects in the Journal Square area, and that Defendants would cooperate with and assist JSP in obtaining the similar non-governmental financing needed for the Project, including tax abatements from the City; and

F.    That JSP was required to make a $2.5 million contribution to Loew's Theatre in Journal Square to obtain status as the designated redeveloper.

26.    At the time that Defendants consented to the assignment of the Project to JSP, and designated JSP as the Project redeveloper, Mr. Trump had not yet declared his candidacy for public office, nor was his son-in-law, Jared Kushner, involved in any way as either a campaign advisor for Mr. Trump, or as a public official.  Rather, at the time the Redevelopment Agreement

8

was entered into, Jared Kushner was the CEO of the Kushner Companies, which possessed an ownership interest in JSP.

### C.    The Redevelopment Agreement

27.    On or about April 21, 2015, JSP and the JCRA entered into the Redevelopment Agreement.  See annexed Exhibit A.

28.    The JCRA, in negotiating and executing the Redevelopment Agreement, acted as "an instrumentality of the City of Jersey City," as is expressly set forth in the Redevelopment Agreement.  As noted above, Fulop appointed the members of the JCRA and controlled its actions, including in connection with the negotiation of the Redevelopment Agreement and the JCRA's performance thereunder.  The JCRA would not have executed the Redevelopment Agreement without the approval of Fulop.

29.    Due to the complexity of the Project, the parties recognized during negotiations the critical need for flexibility to adjust the projected timelines under the Redevelopment Agreement, including the deadlines for: (i) obtaining the requisite Government Approvals for the Project; (ii) financing the Project; and (iii) commencement and completion of construction of the Project.  The parties recognized that a myriad of factors and issues could arise in a project of this magnitude, and had learned as much from the difficulties encountered in connection with the Prior Redevelopment Agreement with MEPT.  As a result, the Redevelopment Agreement included robust contractual provisions to ensure flexibility in performance, required cooperation and good faith dealing between the parties, and required adjustments to the timetables for approvals, financing, and construction as necessary.

30.    Under the Redevelopment Agreement, the first step in commencing construction of the Project was for JSP to obtain various "Governmental Approvals," which was defined in the Redevelopment Agreement to include "[a]ny approvals, authorizations, permits, licenses and

certificates needed from governmental authorities having jurisdiction, whether federal, state, county or local, to the extent necessary to implement the Project in accordance with the Redevelopment Plan and this Agreement."

31.     The Redevelopment Agreement makes plain the parties' agreement to meet in good faith to adjust timetables necessary to ensure completion of the Project.  For example, § 3.01 of the Redevelopment Agreement required the JCRA to cooperate with and support JSP in obtaining Governmental Approvals and financing.  That provision states:

> The Agency shall, at the sole cost and expense of the Redeveloper, and following the reasonable request by the Redeveloper, cooperate and assist the Redeveloper in the preparation and prosecution of any applications for Governmental Approvals required for the Project as well as in the processing of applications to Financial Institutions for financing the Project.  The Agency shall support any application filed by the Redeveloper with the City Planning Board for approval of any site or subdivision plans or maps provided that such plans conform to the ordinances of the City, the Redevelopment Plan and this Agreement, and provided that the Agency has already approved the plans in writing pursuant to this Agreement.

32.     It was understood by all parties that the massive scope of the Project would require both conventional financing as well as government funding through a long-term tax exemption from the City via a payment in lieu of taxes ("PILOT") and the issuance of Redevelopment Area Bonds ("RABs") by the City.

33.     Specifically, the Redevelopment Agreement states in § 4.01(b) that JSP's obligations under the contract were "subject to the Redeveloper . . . (ii) receiving approval of a long term tax exemption from the City for the Project; [and] (iii) obtaining approval for the issuance of Redevelopment Area Bonds from the City and the Local Finance Board . . . ."

34.     The Redevelopment Agreement obligated Defendants to cooperate with and assist JSP in obtaining approvals and private financing, consistent with the public/private nature of the

Project.  Section 4.02 of the Redevelopment Agreement also obligates the JCRA and the City to "cooperate in the processing of governmental and quasi-governmental funding applications from sources other than Financial Institutions for financing any part of the Project."  Thus, the Redevelopment Agreement contemplated that Defendants would cooperate with JSP to obtain the contemplated tax abatement and RABs that had been issued to the Prior Redeveloper as well as in connection with virtually all major developers in Jersey City over the last decade.

35.    The Redevelopment Agreement also included a Schedule C-1 entitled "Construction Timetable," pursuant to which the parties were required to, in good faith, agree to extend the projected completion dates for tasks as was reasonably required based upon JSP's ability to obtain financing.  Schedule C-1 states:

> In the event that the Redeveloper does not obtain firm commitments for financing and any equity capital necessary to construct the Improvements for Phase I of the project, the Agency may, in its reasonable discretion, consent to reasonable adjustments to the Construction Timetable for Phase I of the Project as requested by the Redeveloper. . . . [T]he Agency may consent to such an adjustment which consent shall not be unreasonably denied, delayed or withheld.

36.    That good faith requirement precluding the JCRA from unreasonably objecting to extensions of deadlines on Schedule C-1 is reiterated in § 2.10, which provides:

> The Redeveloper may request the Agency's consent, which shall not be unreasonably withheld, delayed or denied, to extend dates for performance by the Redeveloper pursuant to the Schedules C-1 and C-2 . . . . Notwithstanding anything to the contrary contained in the Agreement, in the event Redeveloper is unable, despite its good faith efforts and without otherwise being in default, to obtain all Governmental Approvals necessary to commence and complete construction of the Improvements for all or any part of the Project, judicial appeals having been exhausted, then, not later than sixty (60) days following the date of issuance of a final determination on appeal, the parties shall reconvene to determine in good faith the method and timing for obtaining all necessary Governmental Approvals for a revised Project plan and amending this Agreement accordingly, such determination to [be] concluded within ninety

11

(90) days.

37.     Schedule C-1 sets forth the sequence and timing of "tasks," with a "completion date" for each.  It provided, among other things, the following:

| TASK | COMPLETION DATE |
|------|-----------------|
| Initial Contingency Period to satisfy Redeveloper Contingencies | Within 180 days from non-appealable Preliminary and Final Major site plan approved by the Jersey City Planning Board (the "Initial Contingency Period"). |
| Construction Drawings | Within 90 days after the expiration of the Initial Contingency Period. |

38.     The "Redeveloper Contingencies" referenced in Schedule C-1 are defined in § 4.01(b), and include: (a) securing construction and permanent financing; (b) receiving approval of a long-term tax exemption from the City for the Project; (c) the issuance of RABs by the City; and (d) obtaining Economic and Redevelopment Growth ("ERG") funds from the New Jersey Economic Development Authority ("NJEDA").  The Redeveloper Contingencies must be satisfied within the "Initial Contingency Period," as defined in Schedule C-1.  If the Redeveloper Contingencies are not satisfied within the Initial Contingency Period, § 4.01(b) provides that the Initial Contingency Period automatically extends for a period of ninety days.

39.     The Initial Contingency Period does not commence, subject to any extensions (with the JCRA's consent to any such extensions not to be unreasonably withheld), until the Jersey City Planning Board approves the site plan for the Project.

40.     On November 14, 2017, the Jersey City Planning Board unanimously adopted a resolution giving final approval to the amended site plan for the Project.  See annexed Exhibit B. The amended site plan was made necessary as a result of objections from the Federal Aviation Administration ("FAA") to the height of one of the towers contemplated by the Project, and to address objections of the Port Authority of New York and New Jersey ("Port Authority")

12

regarding setback lines.  The Jersey City Planning Board approved the amended site plan in part in reliance upon the report and testimony of a representative of the City Planning Division, who testified on behalf of the City in support of the amended site plan.  On February 20, 2018, the Hudson County Planning Board passed a memorializing resolution, giving its final approval to the site plan (the "Final Planning Board Approval").

41.     Pursuant to the express terms of the Redevelopment Agreement, and without consideration of any agreements between the parties consistent with their duty to consent to extensions of the construction timelines, the time period for JSP to satisfy the Redeveloper Contingencies in § 4.01(b) has thus not expired.  The Initial Contingency Period runs 180 days from "non-appealable Preliminary and Final Major site plan approval," and the appeal period runs 45 days from the date of the Final Planning Board Approval on February 20, 2018, *i.e.*, until April 6, 2018.  The Initial Contingency Period is subject to a further extension of ninety business days pursuant to § 4.01(b).  Accounting for these built-in extensions, the Initial Contingency Period expires, at the earliest, on February 14, 2019.

**D.     The Pledge Agreement**

42.     In April 2015, substantially contemporaneous with the execution of the Redevelopment Agreement, JSP and the JCRA also executed a Pledge Agreement, pursuant to which JSP was required to contribute $2.5 million to the renovation of the Loew's Theatre in Journal Square.  The payment consisted of a $500,000 non-refundable cash contribution and a $2 million irrevocable letter of credit payable to the JCRA.

**E.     JSP's Efforts to Obtain Final Governmental Approvals with the Consent of Defendants**

43.     Consistent with the Redevelopment Agreement, the first step in the development process was to obtain required Governmental Approvals.  To that end, on August 7, 2015, a site

plan application was made to the Jersey City Planning Board to obtain approval of Phase I of the Project.  A resolution approving the application for Phase I was adopted by the Jersey City Planning Board on December 15, 2015.  An application was then made on April 20, 2016, to the Hudson County Planning Board to approve the site plan for Phase I.  The Hudson County Planning Board adopted a resolution approving the site plan application for Phase I on April 20, 2016, subject to various conditions.

44.     Thereafter, on July 29, 2016, JSP submitted an amended site plan application for the Project to the Jersey City Planning Board for approval.  This amended application was filed with the consent of all Defendants, who supported the application.  The application made material changes to the Project, including changing the number of stories of the base/podium, reducing the retail space, increasing commercial space, and increasing the number of parking spaces in the garage from 388 to 910.  The amended site plan also included plans for Phases I and II of the Project (which included designs for two residential towers), a September 11 memorial, and other improvements.

45.     On December 18, 2016, the City Planning Board unanimously passed a resolution memorializing the amended site plan.  The resolution noted that "Jersey City, through its Office of Planning, submitted a written report recommending approval of the application."  The resolution also states that JSP would "continue to negotiate with the Port Authority regarding the match line, limited to surface treatment materials."

46.     JSP then submitted an application for approval of the amended site plan to the Hudson County Planning Board, which passed a resolution memorializing its approval on December 19, 2016.

47.    Thereafter, issues arose regarding the approved amended site plan that required further amendments to the Project.  Those issues included the following:

A.    JSP received a "Notice of Presumed Hazard" from the FAA relating to the proposed height of one of the towers to be constructed.  In substance, the FAA objected to the height of the tower and advised Plaintiffs that the City-approved 79-story tower, which rose to a height of 892 feet, had to be reduced.  Thus, JSP was required to obtain approval of the Project from the FAA, a required Governmental Approval within the meaning of the Redevelopment Agreement.

B.    An issue had arisen with the Port Authority, as an impasse had been reached in discussions relating to a reciprocal easement on the Concourse East portion of the Project.  Because of the inability to obtain an easement from the Port Authority, it was necessary to move the podium away from boundary lines with the neighboring properties of the Port Authority and Hudson County Community College.  In addition, at the request of the Planning Board, and for aesthetic reasons, it became necessary to rotate the towers "to provide a different look of each tower from all points of view."

48.     Because of these issues raised by other governmental entities, on August 23, 2017, JSP submitted an application to again amend the site plan.  The second amended site plan application was submitted with the consent and approval of Defendants.  The revised site plan included, among other things, changes such as (a) the reduction in the height of one of the two towers and an increase in the height of the other tower, (b) a reduction in the size of the parking garage, and a change in the look of the towers required by the Planning Board.

49.    On November 14, 2017, the Jersey City Planning Board adopted a resolution unanimously approving the amended site plan application by a vote of 6-0.  As with the prior site

plan approval, the resolution noted that in approving the amended site plan, the Planning Board relied in part on the staff report and testimony of Tania Marione of the City Planning Division, who recommended "on behalf of the City" the "approval of the Amended Project."

50.     The final Jersey City Planning Board approval sanctioned major changes to the Project site plan to satisfy other governmental authorities and was not obtained until November 14, 2017.  Thereafter, a similar application was made to the Hudson County Planning Board, which did not provide Final Planning Board Approval until February 20, 2018.

**F.     JSP's Substantial Performance of Its Obligations under the Redevelopment Agreement.**

51.     In addition to the key process of obtaining Jersey City and Hudson County Planning Board approval of the site plan, JSP engaged in substantial activities to perform its obligations under the Redevelopment Agreement including, but not limited to, the following:

A.   Obtaining title to lands necessary for development of the Project as approved in the approved site plan;

B.   Making an application for an ERG grant to the NJEDA in connection with the Project, which application was ultimately granted, with the NJEDA awarding a $34 million ERG grant and a $59 million NJ Grow tax credit for the Project;

C.   Entering into and performing under the $2.5 million Pledge Agreement for renovation of Loew's Theatre;

D.   Making applications for the PILOT and RABs as contemplated by the Redevelopment Agreement;

E.   Engaging in discussions and negotiations with governmental entities, such as the FAA and the Port Authority, regarding issues raised by those entities; and

F.   Retaining professionals and consultants to assist in making all applications

16

to the Jersey City and Hudson County Planning Boards for approval of the Project site plan.

52.    Since the execution of the Redevelopment Agreement, JSP has expended in excess of $55 million in performing its obligations under the Agreement.

**G.    After the January 1, 2017 Date for Commencement of Construction, Defendants Never Raised Any Issues with Respect to Same, the Parties Agreed to Adjust the Construction Timetables Due to Delays Caused by Matters Beyond JSP's Control, and Defendants Improperly Elevated Political Considerations over Their Contractual Obligations**

53.    On November 8, 2016, Donald J. Trump was elected president of the United States.

54.    On January 9, 2017, Jared Kushner was named a senior advisor to President-Elect Trump.

55.    President-Elect Trump was sworn into office on January 20, 2017.

56.    While Schedule C-1 of the Redevelopment Agreement established January 1, 2017 as the date for "mobilization and construction commencement" for the Project, all parties understood and agreed that the date was not operative because all dates were dependent upon the expiration of the Initial Contingency Period and the obtaining of all Governmental Approvals necessary for final site plan approval.

57.    As set forth above, significant changes to the site plan were required in 2017 to obtain the approval of the FAA and the Port Authority.  In addition to these changes, which the JCRA and the City consented to, JSP also sought approval in 2017 for the tax abatements and the RABs that are part of the Project financing contemplated by § 4.01(b) of the Agreement.

58.    As discussed above, the JCRA and the City are obligated to cooperate with JSP in obtaining approvals for the tax abatement and RABs under §§ 3.01, 4.01(b), and 4.02 of the Agreement.

17

59.     Throughout the parties' discussions in 2017, the parties were in agreement that the PILOT and RABs were necessary for completion of the Project.  The discussions concerned only the particulars of what tax abatements the City would grant.

60.     In early 2017, after Jared Kushner was named a senior advisor to President Trump, Deputy Mayor Marcos Vigil advised JSP that, for political reasons, JSP should submit its application for tax abatements by April or May or should wait until after elections for mayor and the City Council were held in November.

61.     On April 18, 2017, JSP submitted an application for a PILOT and RABs.

62.     On May 6, 2017, a presentation was given in China by representatives of JSP to potential investors in the Project, during which Nicole Meyer-Kushner (Jared Kushner's sister) made comments about the Project.  The presentation prompted substantial press coverage in the United States media concerning Meyer-Kushner's comments.   Among many others, the *New York Times* ran an article on the same day entitled, "Jared Kushner's sister highlights family ties in pitch to Chinese investors."

63.     The very next day, on May 7, 2017, Fulop, who was up for re-election in November 2017, posted on Facebook a link to the *New York Times* article and made the following comment about JSP and the Project:

> I want to be clear with the residents on where the City stands here. Last week, the Developer of this Project submitted an application to Jersey City for tax subsidy and abatement of this property.  **The administration made clear to the applicant that the City is not supportive of their request** and while the law requires a first reading ordinance vote, if they submit an application I don't see the council voting in favor. . .  [See annexed <u>Exhibit D</u> (emphasis added).]

64.     Fulop's   statement   was   a   repudiation   of   the   contractual   promises   in   the Redevelopment Agreement obligating the City and the JCRA to cooperate with JSP in obtaining

abatements, as well as a repudiation of the course of dealings between the parties through that date.  The statement was made for purely political reasons to curry favor with City residents and to harm the Kushner Companies based on Jared Kushner's role as a senior advisor to Trump.

65.     Thereafter, JSP was advised by City officials that "it's not a good time" for them to deal with the tax abatement application and requested that JSP hold the application back until the elections were over in November.  Based on the understanding that the application would be handled fairly and approved, as contemplated by the Redevelopment Agreement, and the fact that applications of other similarly situated developers received tax abatements (including the Prior Redeveloper of the Project), JSP acquiesced to Defendants' request to withdraw that application.   While the tax abatement application was put on "hold" at the request of City officials, its unwillingness to deal fairly with the application as a result of the Kushner family's relationship with President Trump was improper.  It was obvious to all parties throughout 2017 that the Construction Timetable set forth in Schedule C-1, including the January 1, 2017 date for commencement of "mobilization and construction," had not been met.

66.     All parties discussed and agreed that "reasonable adjustments" to the timetable were required, as contemplated by the express contractual provisions of the Redevelopment Agreement.

67.     At no time in 2017 did the JCRA, the City, or Fulop raise any objection to JSP regarding a failure to meet any dates set forth in Schedule C-1.  To the contrary, the parties agreed to extend the dates.  Towards that end, the parties took action to memorialize the agreement reached to adjust the dates.

68.     Throughout 2017, several draft agreements were circulated to memorialize the extensions necessitated by events beyond JSP's control, as discussed above.

69.     The parties initially conceived of entering into an "Amendment to the Redevelopment Agreement," and on February 13, 2017, counsel for JSP transmitted to the JCRA a draft amendment that reflected the parties' previous agreement that the dates on Schedule C-1, including the date by which construction was to commence, were to be extended.

70.     The next day, on February 14, 2017, the parties executed an Amended and Restated Pledge Agreement, evidencing their dealings and understanding that the January 1, 2017 date for the commencement of construction of the Project was to be extended.  The Amended and Restated Pledge Agreement revised the prior Pledge Agreement so that the $2.5 million contribution by JSP for the renovation of the Loew's Theatre would instead be deemed donated to the "Journal Square Arts Initiative."  This change provided the City with more flexibility in how to utilize those funds, which had already been transferred by JSP by March 2016.  The Amended and Restated Pledge Agreement was entered into at the specific request of the City.

71.     Following the submission by JSP's counsel of the proposed Amendment to the Redevelopment Agreement, counsel for the JCRA suggested that instead of an "amendment" to the Redevelopment Agreement, the parties should memorialize the agreed-upon revisions in the form of an "Amended and Restated Redevelopment Agreement," which JSP agreed to do.

72.     As further updated drafts of the Amended and Restated Redevelopment Agreement were circulated, a meeting was scheduled for September 8, 2017, to discuss same.

73.     The day before the September 8th meeting, which was two months before the mayoral elections, the JCRA canceled the meeting and then unilaterally cut off communications with JSP regarding the Amended and Restated Redevelopment Agreement, the purpose of which

was simply to implement the agreement the parties had already made and under which they were already operating.

74.   Notwithstanding Defendants' sudden cessation of discussions regarding the Amended and Restated Redevelopment Agreement (and any other issues regarding the Project), it was clear to all parties that the amendment was needed simply to memorialize what the parties had already agreed to, *i.e.*, that the timetables in Schedule C-1 were unable to be met due to various issues beyond JSP's control, and that Defendants' elevated their political concerns over the fact that they were required to comply with the contractual covenants.

75.   At no time throughout the entire calendar year 2017 did Defendants, or any of their representatives, even remotely suggest that JSP was in default of its obligations under the Redevelopment Agreement.  Such a position would have been ludicrous in light of Defendants' representatives' appearances before the Jersey City Planning Board to support the amended site plan application, which was not approved until November 14, 2017—seven days after Fulop's re-election.

**H.   The City Violates JSP's Contractual Rights as Redeveloper, and the Political Animus and Calculation of the City's Elected Officials**

76.   At the time of the execution of the Redevelopment Agreement in 2015, the City was supportive of, and excited to have, JSP as the new redeveloper of the Journal Square area. Indeed, Fulop had, in 2014, submitted a letter to the NJDEA in support of the Project in connection with an application for an ERG grant.  As noted above, the City was well aware that one of the principal members of JSP was the Kushner Companies, of which Jared Kushner was then CEO.

77.   However, Defendants ultimately determined to place politics over principle, their obligations under the Redevelopment Agreement, and the law, by engaging in egregious actions

21

to interfere with JSP's ability to develop the Project, following the election of President Trump, Jared Kushner's father-in-law, as president of the United States and following President Trump's appointment of Jared Kushner as a senior advisor.

78.     During 2017, Fulop and his supporters on the City Council were preparing for an election in Jersey City in November 2017.

79.     After Fulop won re-election as mayor, a meeting occurred on January 10, 2018, at Fulop's office, with various representatives of JSP who tried to determine why the Project was not moving forward despite JSP's diligent efforts.  At the meeting, Fulop confirmed that, with respect to JSP's request for tax abatements, which were contemplated by the Redevelopment Agreement, it would be "blatant discrimination" to refuse to provide tax abatements to JSP, particularly when: (a) the Prior Developer, MEPT, was granted same; (b) all other developers similarly situated were provided with such tax abatements; and (c) the Redevelopment Agreement required the JCRA to cooperate in the obtaining of such abatements because they were an integral component in advancing the Project.  Fulop further confirmed during this meeting that the true motive in the denial of tax abatements to the Project was the involvement of the Kushner family, stating that it was "really tough" to move forward with the deal, and that the problem would go away if the Kushners left the deal and a new partner was brought in.

80.     To the press, Fulop candidly acknowledged the City's motivations were the function of political animus against the Kushners, and he related, in substance, that the problems moving forward with the deal would be eased if the family was no longer part of the Project.

81.     On January 24, 2018, Bloomberg published an article quoting Charles Kushner suggesting that JSP anticipated breaking ground on the Project in 2018.

82.     On that same date, after reading the article, Fulop called a member of the KABR Group, a partner with Kushner Companies in the Project, stating angrily, "what the fuck is going on with this article?"  He stated that he could not and would not support the Project.  KABR responded by telling Fulop that regardless of whether he disliked Trump and the Kushners, the Project was good for the City, and it was outrageous that Fulop would not put politics aside and do what was best for the City and comply with the Redevelopment Agreement.

83.     On the same day as his angry exchange with KABR, Fulop tweeted a link to the Bloomberg article and stated:

> I think our office/comment is 100% clear in the story.   Our position has NOT changed + we don't see support for incentives or abatements from the city for this project. . . . I suspect it's DOA. [See annexed Exhibit D.]

84.     Satisfied that he had sufficiently ingratiated himself with his Jersey City constituents, who overwhelmingly voted against President Trump in the 2016 presidential election, and in blatant violation of the Redevelopment Agreement and also his obligations as a public official, Fulop confirmed his political animus by tweeting again on February 20, 2018 that the JSP Project was "DOA."  See annexed Exhibit D.

85.     Fulop's attacks on JSP and the Kushner family were completely transparent, and he made no effort to mask his true motivation.  On April 17, 2018, he arrogantly tweeted that there is a "sense of entitlement that the developer has towards a subsidy."  See annexed Exhibit D.  From this public pronouncement Fulop represented to the public the opposite of what he told JSP privately, namely that he would support tax abatements, that they were called for under the Redevelopment Agreement, and that he advised JSP that the failure to give such abatements was discriminatory because other similarly situated developers received same.  His personal attack with reference to "entitlement" was little more than political grandstanding to enhance his

political prospects regardless of the truth, prior representations, or the Redevelopment Agreement between the parties.

86.     Amidst Fulop's public attacks on JSP and the Project, and in response to the JCRA's and the City's lack of responsiveness in moving forward with the Amended and Restated Redevelopment Agreement and their failure to fulfill their obligation to JSP on a tax abatement, JSP submitted an executed version of the Amended and Restated Redevelopment Agreement to the JCRA and another tax abatement application to Fulop on April 6, 2018.

87.     The JCRA has failed and refused to sign the Amended and Restated Redevelopment Agreement, but, as discussed below, it responded by issuing the Notice of Default.

88.     With regard to the tax abatement application, Fulop was required by N.J.S.A. § 40A:20-8 to submit the application with his recommendation on it to the City Council within sixty days of the application's submission on April 6, 2018, *i.e.*, by June 5, 2018.  Fulop has failed to do so in violation of his statutory obligations, further underscoring his obstructionist efforts against JSP in its efforts to develop the Project.

**I.      The JCRA's Frivolous Notice of Default Is a Self-Serving Pretext Orchestrated by Fulop for Political Purposes and Motivated by Political Animus**

89.     Fulop's political animus towards JSP and the Kushner family culminated in the JCRA's service of the Notice of Default to JSP on about April 17, 2018.  See annexed Exhibit C. The Notice of Default contains knowingly false statements, is nothing short of frivolous, and is a transparent pretext to enhance Fulop's status among the electorate of the City.   Fulop orchestrated the Notice of Default, conspiring with the City entities he controlled, in an attempt to push the Kushner family out of the Project, following his candid acknowledgement on January

10, 2018, that the "problems" with the Project would go away if Kushner Companies was no longer involved with JSP.

90.    The Notice of Default alleges that JSP defaulted under the Redevelopment Agreement by failing to: (1) mobilize and commence construction of Phase I of the Project on or before January 1, 2017, as set forth in the Construction Timetable on Schedule C-1; (2) submit evidence to the JCRA of firm commitments for financing and equity capital necessary to construct the Project within the Initial Contingency Period and any extensions thereof; and (3) obtain or waive the Redeveloper Contingencies within the Initial Contingency Period and any extensions thereof.

91.    Each of these claims is frivolous and legally unsupportable.

1.    Alleged Failure to Mobilize and Commence Construction by January 1, 2017

92.    The JCRA's allegation that JSP defaulted by failing to commence construction by January 1, 2017 illustrates that Defendants' true motives have nothing to do with the contractual obligations, but have everything to do with political considerations. Step four under the Construction Timetable in Schedule C-1 requires that initial construction drawings be completed "within 90 days after expiration of the Initial Contingency Period."

93.    As noted above, the Initial Contingency Period expires 180 days from non-appealable approval of the site plan.  As set forth above, the site plan was not finally approved by the City Planning Board until November 14, 2017, eleven months after the January 1, 2017 construction commencement date, and Final Planning Board Approval was not obtained from the Hudson County Planning Board until February 20, 2018.

94.    As set forth above, the Initial Contingency Period does not expire until February 14, 2019.  Accordingly, the initial construction drawings are not even required to be prepared

until May 2019.  And this assumes that the parties had not agreed to adjust the construction timetable in accordance with the Redevelopment Agreement, which they did.

95.     Any delays in commencement of construction were caused by either (a) governmental authorities requiring changes to the site plan, or (b) inaction by Defendants due to political considerations related to the re-election of Fulop.  The parties had reached an agreement, under any circumstances, to extend and adjust the construction timetable.

96.     The actions of Defendants in failing to assist in obtaining tax abatements and supporting PILOT and RAB applications, as contemplated by § 4.01(b) of the Redevelopment Agreement, Fulop's statement that the abatement applications were "DOA," and the fact that the City did not "support incentives or abatements" constitute breaches of the Redevelopment Agreement.

97.     Thus, the alleged default for failure to mobilize and commence construction by January 1, 2017, as set forth in the Notice of Default, is utterly meritless, in violation of the good-faith obligations of the Redevelopment Agreement, and was motivated solely by political animus.

98.     At no time up to April 17, 2018, did any Defendant state or give notice that JSP was in default, because it would be impossible to commence construction until all approvals were obtained, as set forth in the Redevelopment Agreement.

2.     Alleged Failure to Submit Evidence of Commitments for Financing

99.     Defendants' claim in the Notice of Default that JSP failed to show evidence of firm commitments for financing before the expiration of the Initial Contingency Period or any extensions thereof in accordance with § 4.01(b) is also utterly meritless.

100.    As set forth above, the Initial Contingency Period, which is calculated as 180 days from final major site plan approval would not expire, assuming it was not extended, until February 14, 2019 – nine months from the date the Notice of Default was issued.  The financing commitments could be submitted any time up through that date and, even then, further adjusted as called for under the Redevelopment Agreement.

101.    Asserting this as a basis for default is an obvious pretext orchestrated by Fulop, through his appointed representatives on the JCRA, to achieve his political goal of harming the Kushner family and to curry favor with his decidedly anti-Trump electorate.

### 3.  Alleged Failure to Obtain or Waive Redeveloper Contingencies

102.    The JCRA's contention in the Notice of Default that JSP failed to obtain or waive the Redeveloper Contingencies on or before the expiration of the Initial Contingency Period or any extension thereof is utterly meritless.

103.    As noted above, JSP has at least until February 14, 2019, to either waive or satisfy the Redeveloper Contingencies under § 4.01(b) of the Agreement.

104.    Fulop and the other Defendants are fully aware of this fact but served the Notice of Default containing fabricated claims of default.

105.    Fulop has, under color of law, conspired with the other Defendants to orchestrate the events described in the Notice of Default, which contains false and fabricated claims of default.

106.    The issuance of the fabricated Notice of Default caused harm and damage to JSP and interfered with JSP's ability to obtain the required approvals and begin construction on the Project.  Among other things, and without limitation, the fabricated Notice of Default caused

JSP's lender to serve a Notice of Default on a $57 million bridge loan needed to support the Project.

107.    The pronouncements of Fulop, and his subordinates, and actions taken by the JCRA, falsely conveyed the impression to the public that JSP has not honored the Redevelopment Agreement, and that they have defaulted in their obligations thereunder.  These statements by Fulop, orchestrated by him through the other Defendants, were designed to, and have in fact, caused substantial damage and irreparable harm to JSP.

108.    Immediately following the issuance of the Notice of Default, the *Hudson County View* published an article entitled, "JCRA says Kushner Cos. Violated their Redevelopment Agreement on $800 Million Project."  Eager to capitalize on the fabricated Notice of Default he orchestrated, and desirous of brandishing the anti-Trump/Kushner bias in his political community, Fulop sought to take credit, publishing what he told JSP back on January 10, 2018, *i.e.*, that Kushner would be replaced with a different partner.  On April 18, 2017, Fulop tweeted a link to the article and stated:

> Last night the Jersey City Redevelopment Agency defaulted
> Kushner/KABR on their Redeveloper Agreement w/#Jersey City -
> it's important as we're tired of the delays - **hopefully this will now
> move to a different partner that can complete the project**.  [See
> annexed Exhibit D (emphasis added).]

### FIRST COUNT
**(Breach of Contract)**

109.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

110.    As set forth above, the JCRA and JSP are parties to the Redevelopment Agreement.

111.    As set forth in the Redevelopment Agreement, the JCRA acted as an instrumentality of the City and acted on behalf of, and at the direction of, the City and its representatives at all relevant times with respect to the execution, amendment, and performance of the Redevelopment Agreement.

112.    As set forth above, JSP has performed its obligations diligently and in good faith, as evidenced by its expenditure of $55 million in acquisition and development costs.

113.    The Redevelopment Agreement was amended by agreement of the parties with respect to the timetable for performance of the obligations under Schedule C-1.  As contemplated by the Redevelopment Agreement, a variety of events beyond JSP's control, outlined above, prompted the extension of the Construction Timetable, including the necessity to amend the site plan in response to objections by the FAA and the Port Authority, and delays caused by Defendants for political considerations.

114.    The Redevelopment Agreement contained provisions, including §§ 3.01, 4.01, and 4.02, and Schedule C-1, that required the parties to act in good faith to extend the Project timelines as necessary.

115.    On April 17, 2018, Defendants caused to be issued the Notice of Default, which is little more than a transparent attempt by Defendants to interfere with and impair JSP's contractual and property rights in the Project.

116.    The actions of Defendants are in breach of the Redevelopment Agreement, in its original form, and as amended by the parties.  Defendants' wrongful conduct includes, among other things, the following actions:

    A.    Issuance of the frivolous Notice of Default contending that the timetables under the Redevelopment Agreement have not been met;

B.     After agreeing to adjust the construction timetable in Schedule C-1, failing to execute the Amended and Restated Redevelopment Agreement prepared to memorialize that agreement;

C.     Repudiating its obligation to operate with and facilitate the obtaining of tax abatements and other quasi-governmental financing required under the Redevelopment Agreement;

D.     Making public statements conveying the false impression that JSP had not honored the Redevelopment Agreement, to the effect of interfering with JSP's financing and resulting in, among other things, JSP's lender serving a letter of default regarding a $57 million bridge loan.

117.   The actions of Defendants have delayed JSP's ability to move forward and complete the Project and have caused substantial damage.

118.   As a direct and proximate result of this conduct, JSP has suffered damages in an amount currently estimated at $300 million, together with costs, expenses, and reasonable attorneys' fees.

119.   The subject matter of the Redevelopment Agreement is unique, thus entitling JSP to an Order compelling Defendants to specifically perform their obligations under the Redevelopment Agreement.

120.   There exists a justiciable controversy between the parties to warrant the issuance of a declaratory judgment from the Court that JSP is not in breach of the Redevelopment Agreement as alleged in the Notice of Default.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.     Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's

rights under the Redevelopment Agreement, as amended;

B.     Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.     Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extensions pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.     Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.     Compensatory damages;

F.     Attorneys' fees and costs of suit; and

G.     Such other and further relief as the Court may deem equitable and just.

## SECOND COUNT
### (Breach of Cooperation Covenant)

121.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

122.    As set forth above, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1 of the Redevelopment Agreement impose express contractual obligations upon Defendants to fully cooperate with JSP regarding adjustments to the timetables for obtaining Governmental Approvals, and securing private financing and governmental and quasi-governmental financing for commencement of construction.

31

123.    Defendants have breached the express covenants of cooperation by failing to cooperate and issuing the frivolous Notice of Default, which has had the effect of interfering with and impeding JSP's ability to commence with development of the Project, as it illegally and improperly created uncertainty in the public's mind regarding JSP's status as the redeveloper of the Project.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.    Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.    Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.    Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.    Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.    Compensatory damages;

F.    Attorneys' fees and costs of suit; and

G.    Such other and further relief as the Court may deem equitable and just.

## THIRD COUNT
### (Breach of Covenant of Good Faith and Fair Dealing)

124.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

125.    There is implied, as a matter of law, a covenant of good faith and fair dealing in the Redevelopment Agreement, and the amendments thereto, to the same extent as if same were expressly set forth therein, mandating that Defendants deal with JSP with the utmost good faith and honesty and not engage in any act that would have the effect of depriving JSP of the fruits of the Redevelopment Agreement.

126.    By virtue of the conduct of Defendants, as set forth in detail above, they have violated the covenant of good faith and fair dealing.

127.    By virtue of the foregoing, JSP has suffered and will continue to suffer irreparable harm and damage.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.    Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.    Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.    Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the

Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

      D.     Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

      E.     Compensatory damages;

      F.     Attorneys' fees and costs of suit; and

      G.     Such other and further relief as the Court may deem equitable and just.

## FOURTH COUNT
### (Promissory Estoppel)

128.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

129.    In April 2015, Defendants made promises to JSP that they would cooperate with JSP in its efforts to develop the Project and would not unreasonably withhold consent to adjustments of the time periods for obtaining Governmental Approvals, financing and commencement of construction.

130.    Subsequent thereto, as JSP diligently proceeded forward to perform, although the Redevelopment Agreement provided a January 1, 2017 construction commencement date, Defendants made further promises and assurances to JSP that they would agree to adjustments to the Project timeline due to a variety of issues beyond JSP's control, which made commencement of construction by January 1, 2017 impossible.

131.    Defendants repeatedly assured JSP not to be concerned about the January 1, 2017 date and the parties circulated written agreements to memorialize their understanding that the dates of the timeline would be adjusted and extended.  JSP reasonably relied upon Defendants' representations and promises, as set forth above.  Among other things, JSP has submitted

amended site plan applications for the Project, executed an Amended and Restated Pledge Agreement, spent in excess of $55 million, and has otherwise acted to its detriment and to the benefit of Defendants.

132.    Defendants repudiated these repeated promises and representations by issuance of the Notice of Default on April 17, 2018, fifteen and one-half months after the January 1, 2017 date for the commencement of construction, which was the first time Defendants raised the issue.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.    Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.    Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.    Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.    Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.    Compensatory damages;

F.    Attorneys' fees and costs of suit; and

G.    Such other and further relief as the Court may deem equitable and just.

## FIFTH COUNT
### (Violations of Plaintiffs' Rights to Substantive Due Process, Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988)

133.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

134.    At all times relevant to this action, Plaintiffs have had, and continue to have, a protected constitutional interest in and to the contractual rights set forth in the complex Redevelopment Agreement, and the underlying property on which the Project is to be developed. Plaintiffs also have the right to be free from unlawful action by Defendants, who are acting under color of law with respect to the property rights of Plaintiffs.

135.    Based on the facts set forth above, Fulop, the Democratic Mayor of Jersey City, with malice and intent, began encouraging his appointees to the JCRA to issue the Notice of Default as a pretext for his motive of political animus against the sitting President of the United States, Donald J. Trump, a Republican, and those closely associated with him, including Senior Advisor to the President, Jared Kushner.

136.    Defendants' actions are not related to a legitimate State interest, and are motivated by bias, bad faith and/or partisan political reasons and personal reasons unrelated to a proper governmental purpose and shock the conscience.

137.    In directing the JCRA and City employees to take the actions described above, Fulop was acting under color of State law at all relevant times.

138.    Defendants' actions violate Plaintiffs' right to substantive due process under the Fourteenth Amendment to the U.S. Constitution and Plaintiffs have been, and will continue to be, damaged by such actions.

36

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.      Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.      Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.      Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.      Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.      Compensatory damages;

F.      Punitive damages;

G.      Plaintiffs' costs of suit, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §§ 1983 and 1988; and

H.      Such other and further relief as the Court may deem equitable and just.

### SIXTH COUNT
**(Violation of Plaintiffs' Right to Equal Protection,
Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988)**

139.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

140.    As set forth above, Defendants, acting under color of law, have violated Plaintiffs' constitutional rights by interfering with Plaintiffs' ability to develop the Project for improper political motives and by treating Plaintiffs differently from others similarly situated, both as to the application and procurement of the tax abatements and other quasi-governmental financing contemplated by the Redevelopment Agreement, and as to the extension of timetables set for performance under the Redevelopment Agreement.

141.    Plaintiffs own a protected property right in the Project as the redeveloper pursuant to the Redevelopment Agreement.

142.    Defendants have no rational basis for treating Plaintiffs differently from others similarly situated.  Defendant Fulop acknowledged that his motives were solely political and motivated by an intent of harming anyone close to the president of the United States.

143.    As set forth above, and based upon Fulop's public pronouncements and statements in the media, the motives causing him to treat Plaintiffs differently from those similarly situated derived from his personal political ambitions and desire to garner increased popularity by publicly and aggressively opposing the president and those closely associated with him, including Jared Kushner.

144.    Defendants' actions were, and continue to be, irrational and wholly arbitrary.

145.    As such, Defendants' actions violate Plaintiffs' right to equal protection under the Fourteenth Amendment to the U.S. Constitution and under the Constitution of the State of New Jersey.

146.    As a direct and proximate result of Defendants' violation of JSP's constitutional rights, Plaintiffs have suffered substantial damages.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.     Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.     Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.     Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.     Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.     Compensatory damages;

F.     Punitive damages;

G.     Plaintiffs' costs of suit, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §§ 1983 and 1988; and

H.     Such other and further relief as the Court may deem equitable and just.

## SEVENTH COUNT
### (Violation of Plaintiffs' Right to Exercise Free Speech, First Amendment to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988)

147.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

148.    At all times relevant to this action, Plaintiffs have had and continue to have a protected constitutional interest in and to the contractual and property rights related to the Project.

149.    In connection therewith, Plaintiffs have a right to be free from unlawful action by Defendants, including any attempt to deprive Plaintiffs of the ability to exercise their free speech rights through participation in public discourse.

150.    Jared Kushner, former CEO of the Kushner Companies, is widely known to currently serve as senior advisor to the sitting president of the United States, Donald J. Trump.

151.    The activities of Jared Kushner constitutes protected political speech, including but not limited to his participation in public service for the Trump Administration.

152.    Defendants' issuance of the Notice of Default was an act of retaliation for Plaintiffs' exercise of their First Amendment rights.

153.    Defendants' actions in retaliating against Plaintiffs for exercise of free speech and political expression is sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights.  The actions of Defendants have the effect of depriving Plaintiffs, and their beneficial owners, of the property rights in the Project.

154.    Defendants' actions are not rationally related to a legitimate State interest and/or are motivated by bias, bad faith, and/or partisan political reasons and personal reasons unrelated to a proper governmental purpose.

155.    Defendants' actions against Plaintiff are based upon their intent to retaliate against Plaintiffs for exercise of the aforesaid First Amendment rights.

156.    By Defendants' acts set forth above, they have violated Plaintiffs' right to be free from retaliation under 42 U.S.C. § 1983 and the First Amendment to the U.S. Constitution.

157.    Defendants' actions in violating Plaintiffs' constitutional rights have caused Plaintiffs to suffer substantial damages.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.    Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.    Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.    Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.    Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.    Compensatory damages;

F.    Punitive damages;

G.    Plaintiffs' costs of suit, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §§ 1983 and 1988; and

H.    Such other and further relief as the Court may deem equitable and just.

**EIGHTH COUNT**
**(Violation of Plaintiffs' Right of Free Association,**
**First Amendment to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988)**

158.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

159.    Plaintiffs have the right to be free from unlawful action by Defendants, including attempts to deprive Plaintiffs of the ability to exercise their right of free association under the First Amendment of the U.S. Constitution.  Defendants, by their actions set forth above, deprived Plaintiffs of their First Amendment Rights of free association by engaging in retaliatory action for the exercise of those rights.

160.    Defendants' actions are not rationally related to a legitimate State interest and/or are motivated by bias, bad faith, and/or partisan political reasons or personal reasons unrelated to a proper governmental purpose.

161.    Defendants' actions in retaliating against Plaintiffs' exercise of free association rights are sufficient to deter a person of ordinary firmness from exercising such rights.

162.    Defendants' actions against Plaintiffs are based on their intent to retaliate against Plaintiffs for the exercise of their First Amendment rights.

163.    As a direct and proximate result of Defendants' violation of Plaintiffs' constitutional rights, Plaintiffs have suffered, and will continue to suffer, substantial damages.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.    Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.    Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the

redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.     Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.     Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.     Compensatory damages;

F.     Punitive damages;

G.     Plaintiffs' costs of suit, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §§ 1983 and 1988; and

H.     Such other and further relief as the Court may deem equitable and just.

## NINTH COUNT
### (Violation of Procedural Due Process Rights, Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988)

164.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

165.    The Notice of Default was issued with the intention to deprive Plaintiffs of their property rights in the Project and did, in fact, deprive Plaintiffs of their property rights in the Project without due process of law.

166.    Despite reasonable efforts to obtain relief from the sham Notice of Default, Defendants have failed and refused to address any of the fundamental flaws in the Notice.

167.    Defendants have violated 42 U.S.C. § 1983 and the due process clause of the U.S. Constitution affording procedural due process in depriving Plaintiffs of their property rights in the Project.  Plaintiffs have been, and will continue to be, damaged by Defendants' violation of its due process rights.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.    Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.    Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.    Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.    Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.    Compensatory damages;

F.    Punitive damages;

G.    Plaintiffs' costs of suit, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §§ 1983 and 1988; and

H.      Such other and further relief as the Court may deem equitable and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by a jury in this action of all issues so triable.


SILLS CUMMIS & GROSS P.C.


By: *Joseph B. Fiorenzo*
    Joseph B. Fiorenzo, Esq.
    David L. Cook, Esq.
    Michael J. Sullivan, Esq.
One Riverfront Plaza
Newark, New Jersey 07102-5400
(973) 643-7000
jfiorenzo@sillscummis.com
dcook@sillscummis.com
msullivan@sillscummis.com

*Attorneys for Plaintiffs*

Dated:  June 27, 2018

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

I, counsel of record for Plaintiffs in the above-referenced matter, hereby certify that the matter in controversy is not the subject of any other action pending in any court, or any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

SILLS CUMMIS & GROSS P.C.


By: *Joseph B. Fiorenzo*
    Joseph B. Fiorenzo, Esq.
    One Riverfront Plaza
    Newark, New Jersey 07102-5400
    (973) 643-7000
    jfiorenzo@sillscummis.com

    *Attorneys for Plaintiffs*

Dated:  June 27, 2018

## CERTIFICATION OF NON-ARBITRABILITY
## PURSUANT TO LOCAL RULE 201.1(d)

I, counsel of record for Plaintiffs in the above-referenced matter, hereby certify that the relief requested in this matter includes non-monetary relief, and the damages potentially recoverable in this matter exceed the sum of $150,000, exclusive of interest and costs of any claim for punitive damages.  Accordingly, Local Rule 201.1(d) does not apply to this matter.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

SILLS CUMMIS & GROSS P.C.

By: *Joseph B. Fiorenzo*
Joseph B. Fiorenzo, Esq.
One Riverfront Plaza
Newark, New Jersey 07102-5400
(973) 643-7000
jfiorenzo@sillscummis.com

*Attorneys for Plaintiffs*

Dated:  June 27, 2018