Joseph B. Fiorenzo, Esq.
David L. Cook, Esq.
Stephen Klein, Esq.
**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, New Jersey 07102
Tel. (973) 643-7000
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ONE JOURNAL SQUARE PARTNERS URBAN RENEWAL COMPANY LLC, ONE JOURNAL SQUARE TOWER NORTH URBAN RENEWAL COMPANY LLC, and ONE JOURNAL SQUARE TOWER SOUTH URBAN RENEWAL COMPANY LLC,** | |
| **Plaintiffs,** | **Civil Action No. 18-cv-11148 (JMV) (JBC)** |
| v. | **SECOND AMENDED COMPLAINT AND JURY DEMAND** |
| **JERSEY CITY REDEVELOPMENT AGENCY, CITY OF JERSEY CITY, and STEVEN FULOP,** | |
| **Defendants.** | |

Plaintiffs, One Journal Square Partners Urban Renewal Company LLC, One Journal Square Tower North Urban Renewal Company LLC, and One Journal Square Tower South Urban Renewal Company LLC (collectively, "JSP" or "Plaintiffs"), for their Second Amended Complaint against Defendants the Jersey City Redevelopment Agency (the "JCRA"), the City of Jersey City (the "City"), and Steven Fulop ("Fulop," and collectively, "Defendants"), allege and state as follows:

## SUMMARY OF ACTION

1.      JSP is the owner of certain property located at One Journal Square in Jersey City, New Jersey, upon which JSP has received approval to construct two 56-story residential towers containing 1,512 residential units above a ten-story podium containing approximately 96,000 square feet of retail space, 118,000 square feet of commercial space, amenities for residents of the towers, a landscaped plaza with an estimated cost of $10.6 million, and an 864-space parking garage (the "Project" or "Project Premises").  The Project has an estimated cost of approximately $900 million and is intended to transform and revitalize the blighted Journal Square area of Jersey City, which has been designated as an area in need of redevelopment by the City.  For over three years, JSP has worked diligently to perform its obligations under certain agreements with the JCRA and the City, including the Redevelopment Agreement effective as of April 21, 2015 (the "Redevelopment Agreement").  In doing so, JSP has spent approximately $55 million in application and development costs.  Despite this, Defendants delayed JSP's applications for tax abatements, made public and private statements against JSP's involvement in the Project, and later caused to be issued on April 17, 2018 a letter falsely claiming that Plaintiffs had defaulted in their obligations under the Redevelopment Agreement (the "Notice of Default").  The delay of tax abatements, public and private statements and, ultimately, the issuance of the Notice of Default were motivated solely by political animus towards Plaintiffs due to the fact that one of the principal investors in JSP is the Kushner Companies LLC ("Kushner Companies"), which was formerly run by Jared Kushner, currently a senior advisor to President Donald J. Trump. These actions by Defendants were intended to appease and curry favor with the overwhelmingly anti-Trump constituents of Jersey City.

2.      JSP brings this action against Defendants for violation of its constitutional rights, breach of contract, breach of the covenant of good faith and fair dealing, and for various other

legal and equitable relief as a result of Defendants' unlawful Notice of Default and other actions leading up to that Notice of Default, which represent a repudiation of the long course of dealing between the parties, are contrary to the contractual obligations of Defendants under the Redevelopment Agreement, are motivated purely by political animus towards President Trump, and constitute little more than a transparent and illegal attempt to deprive Plaintiffs of their property rights under color of law, in violation of 42 U.S.C. § 1983.

## THE PARTIES

3.      Plaintiff One Journal Square Partners Urban Renewal Company LLC is a New Jersey limited liability company with its principal place of business located at 100 Challenger Road, Suite 401, Ridgefield Park, New Jersey.  One Journal Square Partners Urban Renewal Company LLC conducts business in this district, and the real property that is the subject of this dispute is located in this judicial district.

4.      Plaintiff One Journal Square Tower North Urban Renewal Company LLC is a New Jersey limited liability company with its principal place of business located at 100 Challenger Road, Suite 401, Ridgefield Park, New Jersey.  One Journal Square Tower North Urban Renewal Company LLC conducts business in this judicial district.

5.      Plaintiff One Journal Square Tower South Urban Renewal Company LLC is a New Jersey limited liability company with its principal place of business located at 100 Challenger Road, Suite 401, Ridgefield Park, New Jersey.  One Journal Square Tower South Urban Renewal Company LLC conducts business in this judicial district.

6.      Defendant JCRA is an agency and instrumentality of the City and is located in this judicial district.  The JCRA is controlled by Fulop, the mayor of the City, who directs its actions.   The JCRA Board of Directors and Officers (the "Board") consists of seven

3

commissioners and is led by a chairman and vice chair.  The chairman has at all relevant times been Rolando Lavarro, who also serves as president of the City Council.  Lavarro has long been a close ally of Fulop and the two ran on the same ticket in the 2013 and 2017 Jersey City elections.  Daniel Rivera is a commissioner on the Board, and another City councilman who ran on the same ticket as Fulop and Lavarro in 2013 and 2017.  The five remaining commissioners of the JCRA were all appointed by Fulop.  The acting executive director of the JCRA is Diane Jeffrey, a close Fulop confidant, who has also served as assistant corporation counsel to the City since the summer of 2013, when Fulop was elected mayor.  As noted in the Redevelopment Agreement, the JCRA is a mere "instrumentality" of the City, and is directed and controlled by Fulop.

7.      Defendant City is a municipal corporation, incorporated as a body politic in Hudson County.  Fulop was elected mayor of the City on May 14, 2013, and assumed office on July 1, 2013.  Fulop and members of the City Council are all members of the Democratic Party.  The residents of the City are predominantly aligned with the Democratic Party, as evidenced by the 2016 presidential election in which 82.7% of City voters voted for Hillary Clinton and 14.2% voted for President Trump.

8.      Defendant Fulop is a resident of the City.  Prior to being elected mayor in 2013, he served for eight years as a City councilman.  Plaintiffs plead against Fulop in his personal, as well as his official, capacity.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 on the basis of federal question jurisdiction, as Plaintiffs allege causes of action under 42 U.S.C. § 1983 and the United States Constitution.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

4

10.     This Court has personal jurisdiction over Fulop because he resides and works in this judicial district.   This Court has personal jurisdiction over the City because it is a municipality situated within this judicial district.   This Court has personal jurisdiction over the JCRA because it is an agency that conducts business and affects development and commerce, presently and at all relevant times herein, in this judicial district, and has a primary place of business in this judicial district.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), among other provisions, because the redevelopment project at issue in this Amended Complaint is being performed on property that is located in this judicial district.   Additionally, a substantial part of the actions and events giving rise to the claim occurred in this judicial district.

**ALLEGATIONS AS TO ALL COUNTS**

**A.      Background**

12.     In 1974, the City Council adopted the Journal Square Redevelopment Plan ("Original Redevelopment Plan"), a comprehensive plan to redevelop the Journal Square area of the City.   As reflected in the Original Redevelopment Plan, Journal Square has been designated as an "area in need of rehabilitation" for approximately fifty years.   The area that was the subject of the Original Redevelopment Plan included Journal Square, the PATH rail station and bus depot, and the surrounding neighborhoods within walking distance.   The area was comprised of approximately 211 acres, 57 city blocks, and approximately 1,600 individual parcels.   The Project Premises constitutes the centerpiece of the Original Redevelopment Plan.   In order to move forward with the redevelopment of the Project Premises, the City, through its instrumentality the JCRA, selected Journal Square Development, LLC (the "First Designated Redeveloper") on March 7, 2006 as the designated redeveloper for the Project Premises.

5

13.     On April 13, 2007, the JCRA consented to an assignment of the First Designated Redeveloper's interest as the designated redeveloper of the Project Premises to a new developer, namely, MEPT Journal Square Urban Renewal, LLC and related entities (the "Prior Redeveloper" or "MEPT"), which became the new redeveloper of Project Premises.

14.     On April 17, 2007, MEPT and the JCRA entered into an Amended and Restated Redevelopment Agreement (the "Prior Redevelopment Agreement").

15.     On or about November 25, 2008, the City adopted Resolution No. 08-879, in which the City, among other things, again designated the Project Premises as an "area in need of rehabilitation," thus reaffirming the same designation made in the 1970s.

16.     In 2010, the City Council revised the Original Redevelopment Plan.  On August 25, 2010, the City adopted Ordinance No. 10-103, which approved the Journal Square 2060 Redevelopment Plan (the "2060 Redevelopment Plan").  The stated objectives of the 2060 Redevelopment Plan include, among other things, re-establishing Journal Square as the City's "primary central business district and activity center" with the Project as its centerpiece, in order to ensure vibrant development in areas of the City other than the Hudson River waterfront.

17.     Fulop has final policy-making authority for the City over the submission of tax abatements.  In furtherance of the goals of the 2060 Redevelopment Plan, Fulop issued Executive Order 2013-004 on December 14, 2013 ("EO 2013-004"), which set forth the City's policies and guidelines for the evaluation and approval of tax abatement applications.  EO 2013-004 states that tax abatements would not be routinely issued for projects along the Jersey City waterfront, as they previously had been, but instead would "be utilized to support and encourage development in other areas of the City, including but not limited to, Journal Square".  The policy was intended "to prioritize the use of [tax abatements] in targeted areas, many of which are

6

existing redevelopment areas, to encourage investment and job creation for the benefit of longstanding residents and businesses of the City." Under the policy, Journal Square was deemed an area "most in need of development." The policy states that, provided an application for tax abatements complied with EO 2013-004's guidelines, it "shall receive Mayoral recommendation and should be approved by the Council."

18.     The policies and guidelines in EO 2013-004 were reaffirmed two years later, when Fulop issued Executive Order 2015-007 on September 3, 2015 ("EO 2015-007," and with EO 2013-004, the "EOs"). That order reiterates the City's policy that tax abatements would be "utilized to support and encourage development in other areas of the City, including but not limited to Journal Square" in order to "encourage investment, job creation and the construction of new affordable housing for the benefit of longstanding residents and businesses of the City." Under the policy, Journal Square is designated an area "most in need of development," and thus eligible for tax abatements. EO 2015-007 also mandates that, should an application comply with the City's policies, it "shall receive Mayoral recommendation and should be approved by the Council."

19.     Given the size and complexity of the plan to redevelop the Journal Square area, the City created an office of tax abatement to award the tax abatements necessary to incentivize and attract developers and investment capital to the area. EO 2015-007 also provides that the City would enforce tax abatements through the Abatement Compliance Office and the Tax Collector's Office in conjunction with the Corporation Counsel's Office, based on objective criteria set forth in the EOs.

20.     For the last decade, the City has acted consistent with the policies of the 2060 Redevelopment Plan and the EOs to draw investment and developers to the Journal Square area.

For example, pursuant to Ordinances 08-164, 08-165 and 08-166 on November 25, 2008, the City approved MEPT's application for a thirty-year tax abatement for the *exact same* project for which JSP has sought a tax abatement.  Similarly, the developers of the nearby Journal Squared project, another large mixed use project in the Journal Square area, were granted a favorable tax abatement package from the City.

21.     In the last ten years, the City has approved similar tax abatement applications for virtually every major development project in the City.  For example, a 30 year tax abatement was approved for a $53 million project at 2 Journal Square in the 2060 Redevelopment Area on November 25, 2014 pursuant to Ordinance 14-154.   The City also approved long-term tax abatements for the following projects for similarly situated developers within the 2060 Redevelopment Area including but not limited to:

| ADDRESS | ORDINANCE | DATE |
|---|---|---|
| 362 Summit Avenue | 16-116 | August 17, 2016 |
| 184-190 Academy St. | 16-145 | September 28, 2016 |
| 880 Bergen Ave. | 16-117 | August 17, 2016 |
| 2853 Kennedy Blvd. | 16-080 | May 11, 2016 |

22.     The City has also approved various long-term tax abatements for projects in other parts of the city, including but not limited to:

| ADDRESS | ORDINANCE | DATE |
|---|---|---|
| 23-26 University Place | 16-104 and 16-105 | July 13, 2016 |
| 442-446 Whiton Street 2-16 Ash Street | 16-137 | September 14, 2016 |
| 13-35 Carbon Place | 16-186 | January 11, 2017 |
| 160 Lafayette Street | 17-118 | September 13, 2017 |

| ADDRESS | ORDINANCE | DATE |
|---|---|---|
| 80 Columbus Drive | 14-130 | October 22, 2014 |

23.     The size, complexity, and cost of the MEPT Project was reflected in the Prior Redevelopment Agreement with MEPT, which contemplated that not only would conventional financing be used for the project, but so would governmental and quasi-governmental financing through tax abatements and other programs to make the Project economically viable.   A fundamental premise to the successful development of the Project was the cooperation of Defendants in obtaining such governmental and quasi-governmental financing.

24.     Following execution of the Prior Redevelopment Agreement, the Prior Redeveloper was required under the contract to engage in a number of activities, including the following: (a) obtaining various governmental approvals necessary for completion of the Project; (b) obtaining, with governmental assistance, tax abatements for the Project; (c) obtaining a commitment for the financing necessary to construct the Project; and (d) building the Project.

25.     Subsequent to the execution of the Prior Redevelopment Agreement, the Prior Redeveloper engaged in substantial activities to perform its obligations under the parties' agreement.

**B.     Plaintiff Is Designated as the New Redeveloper of the Project**

26.     Defendants issued a notice of default to MEPT claiming that it was in breach of the Prior Redevelopment Agreement and that MEPT no longer had any rights in the Project.

27.     As a result of the disputes between MEPT and Defendants, MEPT entered into a Purchase and Sale Agreement with JSP for JSP to purchase MEPT's interest in the Project on February 14, 2014.

28.     At that time, Defendants supported the transfer of the Project from MEPT to JSP, with full knowledge that the Kushner Companies were a principal in JSP and that, at the time, Jared Kushner was CEO of the Kushner Companies.

29.     On May 20, 2014, Defendants consented to the assignment and transfer of the Project from MEPT to JSP, and JSP was at that time deemed the designated redeveloper of the Project.   The result of this assignment and designation of JSP as redeveloper prompted the negotiation of the Redevelopment Agreement between JSP and the JCRA.

30.     During the negotiations, in order to induce JSP to execute the Redevelopment Agreement, Defendants made numerous statements and representations to JSP, including, but not limited to, the following:

A.     That, given the complexity of the Project and the number of issues and problems that could occur in the course of development, Defendants would work in good faith with JSP to adjust the timetable for completion of construction in a reasonable way;

B.     That Defendants would cooperate with and assist JSP in obtaining required Governmental Approvals;

C.     That Defendants would cooperate with and assist JSP in obtaining financing for the Project;

D.     That the Project was in substance a public/private venture and it required cooperation by both sides to achieve the goal of constructing the massive improvements contemplated to revitalize the Journal Square area;

E.     That the Project had received, and the City had issued, tax abatements to the Prior Redeveloper and for other projects in the Journal Square area, and that Defendants would cooperate with and assist JSP in obtaining the similar non-governmental financing needed

for the Project, including tax abatements from the City; and

        F.     That JSP was required to make a $2.5 million contribution to Loew's Theatre in Journal Square to obtain status as the designated redeveloper.

        31.     At the time that Defendants consented to the assignment of the Project to JSP, and designated JSP as the Project redeveloper, Mr. Trump had not yet declared his candidacy for public office, nor was his son-in-law, Jared Kushner, involved in any way as either a campaign advisor for Mr. Trump, or as a public official.  Rather, at the time the Redevelopment Agreement was entered into, Jared Kushner was the CEO of the Kushner Companies, which possessed an ownership interest in JSP.

        **C.**      **The Redevelopment Agreement**

        32.     On or about April 21, 2015, JSP and the JCRA entered into the Redevelopment Agreement.  See annexed Exhibit A.

        33.     The JCRA, in negotiating and executing the Redevelopment Agreement, acted as "an instrumentality of the City of Jersey City," as is expressly set forth in the Redevelopment Agreement.  As noted above, Fulop appointed the members of the JCRA and controlled its actions, including in connection with the negotiation of the Redevelopment Agreement and the JCRA's performance thereunder.  Correspondingly, Fulop had final policy-making authority over the JCRA's execution of its contractual commitments.  The JCRA would not have executed the Redevelopment Agreement without the approval of Fulop.

        34.     Due to the complexity of the Project, the parties recognized during negotiations the critical need for flexibility to adjust the projected timelines under the Redevelopment Agreement, including the deadlines for: (i) obtaining the requisite Government Approvals for the Project; (ii) financing the Project; and (iii) commencement and completion of construction of the Project.  The parties recognized that a myriad of factors and issues could arise in a project of this

magnitude, and had learned as much from the difficulties encountered in connection with the Prior Redevelopment Agreement with MEPT. As a result, the Redevelopment Agreement included robust contractual provisions to ensure flexibility in performance, required cooperation and good faith dealing between the parties, and required adjustments to the timetables for approvals, financing, and construction as necessary.

35.     Under the Redevelopment Agreement, the first step in commencing construction of the Project was for JSP to obtain various "Governmental Approvals," which was defined in the Redevelopment Agreement to include "[a]ny approvals, authorizations, permits, licenses and certificates needed from governmental authorities having jurisdiction, whether federal, state, county or local, to the extent necessary to implement the Project in accordance with the Redevelopment Plan and this Agreement."

36.     The Redevelopment Agreement makes plain the parties' agreement to meet in good faith to adjust timetables necessary to ensure completion of the Project. For example, § 3.01 of the Redevelopment Agreement required the JCRA to cooperate with and support JSP in obtaining Governmental Approvals and financing. That provision states:

> The Agency shall, at the sole cost and expense of the Redeveloper, and following the reasonable request by the Redeveloper, cooperate and assist the Redeveloper in the preparation and prosecution of any applications for Governmental Approvals required for the Project as well as in the processing of applications to Financial Institutions for financing the Project. The Agency shall support any application filed by the Redeveloper with the City Planning Board for approval of any site or subdivision plans or maps provided that such plans conform to the ordinances of the City, the Redevelopment Plan and this Agreement, and provided that the Agency has already approved the plans in writing pursuant to this Agreement.

37.     It was understood by all parties that the massive scope of the Project would require both conventional financing as well as government funding through a long-term tax

exemption from the City via a payment in lieu of taxes ("PILOT") and the issuance of Redevelopment Area Bonds ("RABs") by the City.

38.     Indeed, at the time the parties negotiated and entered into the Redevelopment Agreement, the City's policies and guidelines promoting the approval of PILOTs and RABs in connection with redevelopment projects in Journal Square were firmly established by the 2060 Redevelopment Plan and the EOs issued by Fulop.

39.     The clear intent and effect of the EOs was to eliminate subjective criteria, which fostered political considerations and political cronyism in the awarding of tax abatements, and replace it with objective criteria designed to promote use of abatements in the Journal Square area in need of redevelopment.

40.     As such, the Redevelopment Agreement states in § 4.01(b) that JSP's obligations under the contract were "subject to the Redeveloper . . . (ii) receiving approval of a long term tax exemption from the City for the Project; [and] (iii) obtaining approval for the issuance of Redevelopment Area Bonds from the City and the Local Finance Board . . . ."

41.     The Redevelopment Agreement obligated Defendants to cooperate with and assist JSP in obtaining approvals and private financing, consistent with the public/private nature of the Project.  Section 4.02 of the Redevelopment Agreement also obligates the JCRA and the City to "cooperate in the processing of governmental and quasi-governmental funding applications from sources other than Financial Institutions for financing any part of the Project."  Thus, the Redevelopment Agreement contemplated that Defendants would cooperate with JSP to obtain the contemplated tax abatement and RABs that had been issued to the Prior Redeveloper as well as in connection with virtually all major developers in Jersey City over the last decade.  This contractual commitment was consistent with the existing policies of the City reflected, in part, in

the EOs, which mandated that the tax abatements be granted if the criteria in the guidelines were met.

42.    The Redevelopment Agreement also included Schedule C-1 entitled "Construction Timetable," pursuant to which the parties were required to, in good faith, agree to extend the projected completion dates for tasks as was reasonably required based upon JSP's ability to obtain financing.  Schedule C-1 states:

> In the event that the Redeveloper does not obtain firm commitments for financing and any equity capital necessary to construct the Improvements for Phase I of the project, the Agency may, in its reasonable discretion, consent to reasonable adjustments to the Construction Timetable for Phase I of the Project as requested by the Redeveloper. . . . [T]he Agency may consent to such an adjustment which consent shall not be unreasonably denied, delayed or withheld.

43.    That good faith requirement precluding the JCRA from unreasonably objecting to extensions of deadlines on Schedule C-1 is reiterated in § 2.10, which provides:

> The Redeveloper may request the Agency's consent, which shall not be unreasonably withheld, delayed or denied, to extend dates for performance by the Redeveloper pursuant to the Schedules C-1 and C-2 . . . . Notwithstanding anything to the contrary contained in the Agreement, in the event Redeveloper is unable, despite its good faith efforts and without otherwise being in default, to obtain all Governmental Approvals necessary to commence and complete construction of the Improvements for all or any part of the Project, judicial appeals having been exhausted, then, not later than sixty (60) days following the date of issuance of a final determination on appeal, the parties shall reconvene to determine in good faith the method and timing for obtaining all necessary Governmental Approvals for a revised Project plan and amending this Agreement accordingly, such determination to [be] concluded within ninety (90) days.

44.    Schedule C-1 sets forth the sequence and timing of "tasks," with a "completion date" for each.  It provided, among other things, the following:

| TASK | COMPLETION DATE |
|---|---|
| Initial Contingency Period to satisfy Redeveloper Contingencies | Within 180 days from non-appealable Preliminary and Final Major site plan approved by the Jersey City Planning Board (the "Initial Contingency Period"). |
| Construction Drawings | Within 90 days after the expiration of the Initial Contingency Period. |

45.     The "Redeveloper Contingencies" referenced in Schedule C-1 are defined in § 4.01(b), and include: (a) securing construction and permanent financing; (b) receiving approval of a long-term tax exemption from the City for the Project; (c) the issuance of RABs by the City; and (d) obtaining Economic and Redevelopment Growth ("ERG") funds from the New Jersey Economic Development Authority ("NJEDA").    The Redeveloper Contingencies must be satisfied within the "Initial Contingency Period," as defined in Schedule C-1.  If the Redeveloper Contingencies are not satisfied within the Initial Contingency Period, § 4.01(b) provides that the Initial Contingency Period automatically extends for a period of ninety days.

46.     The Initial Contingency Period does not commence, subject to any extensions (with the JCRA's consent to any such extensions not to be unreasonably withheld), until the Jersey City Planning Board approves the site plan for the Project.

47.     On November 14, 2017, the Jersey City Planning Board unanimously adopted a resolution giving final approval to the amended site plan for the Project.  See annexed Exhibit B. The amended site plan was made necessary as a result of objections from the Federal Aviation Administration ("FAA") to the height of one of the towers contemplated by the Project, and to address objections of the Port Authority of New York and New Jersey ("Port Authority") regarding setback lines.  The Jersey City Planning Board approved the amended site plan in part in reliance upon the report and testimony of a representative of the City Planning Division, who

testified on behalf of the City in support of the amended site plan.  On February 20, 2018, the Hudson County Planning Board passed a memorializing resolution, giving its final approval to the site plan (the "Final Planning Board Approval").

48.     Pursuant to the express terms of the Redevelopment Agreement, and without consideration of any agreements between the parties consistent with their duty to consent to extensions of the construction timelines, the time period for JSP to satisfy the Redeveloper Contingencies in § 4.01(b) has thus not expired.  The Initial Contingency Period runs 180 days from "non-appealable Preliminary and Final Major site plan approval," and the appeal period runs 45 days from the date of the Final Planning Board Approval on February 20, 2018, *i.e.*, until April 6, 2018.  The Initial Contingency Period is subject to a further extension of ninety business days pursuant to § 4.01(b).  Accounting for these built-in extensions, the Initial Contingency Period expires, at the earliest, on February 14, 2019.

**D.     The Pledge Agreement**

49.     In April 2015, substantially contemporaneous with the execution of the Redevelopment Agreement, JSP and the JCRA also executed a Pledge Agreement, pursuant to which JSP was required to contribute $2.5 million to the renovation of the Loew's Theatre in Journal Square.  The payment consisted of a $500,000 non-refundable cash contribution and a $2 million irrevocable letter of credit payable to the JCRA.

**E.     JSP's Efforts to Obtain Final Governmental Approvals with the Consent of Defendants**

50.     Consistent with the Redevelopment Agreement, the first step in the development process was to obtain required Governmental Approvals.  To that end, on August 7, 2015, a site plan application was made to the Jersey City Planning Board to obtain approval of Phase I of the Project.  A resolution approving the application for Phase I was adopted by the Jersey City

Planning Board on December 15, 2015.  An application was then made on April 20, 2016, to the Hudson County Planning Board to approve the site plan for Phase I.  The Hudson County Planning Board adopted a resolution approving the site plan application for Phase I on April 20, 2016, subject to various conditions.

51.     Thereafter, on July 29, 2016, JSP submitted an amended site plan application for the Project to the Jersey City Planning Board for approval.  This amended application was filed with the consent of all Defendants, who supported the application.  The application made material changes to the Project, including changing the number of stories of the base/podium, reducing the retail space, increasing commercial space, and increasing the number of parking spaces in the garage from 388 to 910.  The amended site plan also included plans for Phases I and II of the Project (which included designs for two residential towers), a September 11 memorial, and other improvements.

52.     On December 18, 2016, the City Planning Board unanimously passed a resolution memorializing the amended site plan.  The resolution noted that "Jersey City, through its Office of Planning, submitted a written report recommending approval of the application."  The resolution also states that JSP would "continue to negotiate with the Port Authority regarding the match line, limited to surface treatment materials."

53.     JSP then submitted an application for approval of the amended site plan to the Hudson County Planning Board, which passed a resolution memorializing its approval on December 19, 2016.

54.     Thereafter, issues arose regarding the approved amended site plan that required further amendments to the Project.  Those issues included the following:

A.     JSP received a "Notice of Presumed Hazard" from the FAA relating to the

proposed height of one of the towers to be constructed.  In substance, the FAA objected to the height of the tower and advised Plaintiffs that the City-approved 79-story tower, which rose to a height of 892 feet, had to be reduced.  Thus, JSP was required to obtain approval of the Project from the FAA, a required Governmental Approval within the meaning of the Redevelopment Agreement.

B.      An issue had arisen with the Port Authority, as an impasse had been reached in discussions relating to a reciprocal easement on the Concourse East portion of the Project.  Because of the inability to obtain an easement from the Port Authority, it was necessary to move the podium away from boundary lines with the neighboring properties of the Port Authority and Hudson County Community College.  In addition, at the request of the Planning Board, and for aesthetic reasons, it became necessary to rotate the towers "to provide a different look of each tower from all points of view."

55.      Because of these issues raised by other governmental entities, on August 23, 2017, JSP submitted an application to again amend the site plan.  The second amended site plan application was submitted with the consent and approval of Defendants.  The revised site plan included, among other things, changes such as (a) the reduction in the height of one of the two towers and an increase in the height of the other tower, (b) a reduction in the size of the parking garage, and a change in the look of the towers required by the Planning Board.

56.      On November 14, 2017, the Jersey City Planning Board adopted a resolution unanimously approving the amended site plan application by a vote of 6-0.  As with the prior site plan approval, the resolution noted that in approving the amended site plan, the Planning Board relied in part on the staff report and testimony of Tania Marione of the City Planning Division, who recommended "on behalf of the City" the "approval of the Amended Project."

57.     The final Jersey City Planning Board approval sanctioned major changes to the Project site plan to satisfy other governmental authorities and was not obtained until November 14, 2017.  Thereafter, a similar application was made to the Hudson County Planning Board, which did not provide Final Planning Board Approval until February 20, 2018.

**F.     JSP's Substantial Performance of Its Obligations under the Redevelopment Agreement**

58.     In addition to the key process of obtaining Jersey City and Hudson County Planning Board approval of the site plan, JSP engaged in substantial activities to perform its obligations under the Redevelopment Agreement including, but not limited to, the following:

A.   Obtaining title to lands necessary for development of the Project as approved in the approved site plan;

B.   Making an application for an ERG grant to the NJEDA in connection with the Project, which application was ultimately granted, with the NJEDA awarding a $34 million ERG grant and a $59 million NJ Grow tax credit for the Project;

C.   Entering into and performing under the $2.5 million Pledge Agreement for renovation of Loew's Theatre;

D.   Making applications that complied with applicable governmental policies and/or guidelines for the PILOT and RABs as contemplated by the Redevelopment Agreement;

E.   Engaging in discussions and negotiations with governmental entities, such as the FAA and the Port Authority, regarding issues raised by those entities; and

F.   Retaining professionals and consultants to assist in making all applications to the Jersey City and Hudson County Planning Boards for approval of the Project site plan.

59.     Since the execution of the Redevelopment Agreement, JSP has expended in excess of $55 million in performing its obligations under the Agreement.

**G.      After the January 1, 2017 Date for Commencement of Construction, Defendants Never Raised Any Issues with Respect to Same, the Parties Agreed to Adjust the Construction Timetables Due to Delays Caused by Matters Beyond JSP's Control, and Defendants Improperly Elevated Political Considerations over Their Contractual Obligations**

60.      During the 2016 election cycle and thereafter, Jared Kushner advised the Trump Campaign and Administration with respect to various issues, including but not limited to improved Government operations and services via the White House Office of American Innovation, and U.S. policy in the Middle East.

61.      Charles Kushner held an event at his home for the Trump Campaign.

62.      On November 8, 2016, Donald J. Trump was elected president of the United States.

63.      On January 9, 2017, Jared Kushner was named a senior advisor to President-Elect Trump.

64.      President-Elect Trump was sworn into office on January 20, 2017.

65.      While Schedule C-1 of the Redevelopment Agreement established January 1, 2017 as the date for "mobilization and construction commencement" for the Project, all parties understood and agreed that the date was not operative because all dates were dependent upon the expiration of the Initial Contingency Period and the obtaining of all Governmental Approvals necessary for final site plan approval.

66.      As set forth above, significant changes to the site plan were required in 2017 to obtain the approval of the FAA and the Port Authority.  In addition to these changes, which the JCRA and the City consented to, JSP also sought approval in 2017 for the tax abatements and the RABs that are part of the Project financing contemplated by § 4.01(b) of the Agreement, and pursuant to the EOs.

67.     As discussed above, the JCRA and the City are obligated to cooperate with JSP in obtaining approvals for the tax abatement and RABs under §§ 3.01, 4.01(b), and 4.02 of the Agreement.  The City's policies set forth in the 2060 Redevelopment Plan and the EOs also required the approval of tax abatements for development projects such as the Project in the Journal Square area.

68.     Throughout the parties' discussions in 2017, the parties were in agreement that the PILOT and RABs were necessary for completion of the Project.  The discussions concerned only the particulars of what tax abatements the City would grant.

69.     In early 2017, after Jared Kushner was named a senior advisor to President Trump, Deputy Mayor Marcos Vigil advised JSP that, for political reasons, JSP should submit its application for tax abatements by April or May or should wait until after elections for mayor and the City Council were held in November.

70.     On April 18, 2017, JSP submitted an application for a PILOT and RABs.

71.     On May 6, 2017, a presentation was given in China by representatives of JSP to potential investors in the Project, during which Nicole Meyer-Kushner (Jared Kushner's sister) made comments about the Project.  The presentation prompted substantial press coverage in the United States media concerning Meyer-Kushner's comments.  Among many others, the *New York Times* ran an article on the same day entitled, "Jared Kushner's sister highlights family ties in pitch to Chinese investors."

72.     The very next day, on May 7, 2017, Fulop, who was up for re-election in November 2017, posted on Facebook a link to the *New York Times* article and made the following comment about JSP and the Project:

> I want to be clear with the residents on where the City stands here.
> Last week, the Developer of this Project submitted an application

to Jersey City for tax subsidy and abatement of this property. **The administration made clear to the applicant that the City is not supportive of their request** and while the law requires a first reading ordinance vote, if they submit an application I don't see the council voting in favor. . . . [See annexed <u>Exhibit C</u> (emphasis added).]

73.      Fulop's statement was a repudiation of the contractual promises in the Redevelopment Agreement obligating the City and the JCRA to cooperate with JSP in obtaining abatements, as well as a repudiation of the course of dealings between the parties through that date.  It also contradicted the policies for the approval of tax abatements set forth in Fulop's EOs. The statement was made for purely political reasons to curry favor with City residents and to harm the Kushner Companies based on Jared Kushner's role as a senior advisor to Trump.

74.      Thereafter, JSP was advised by City officials that "it's not a good time" for them to deal with the tax abatement application and requested that JSP hold the application back until the elections were over in November.  Based on the understanding that the application would be handled fairly and approved, as contemplated by the Redevelopment Agreement and the EOs, and the fact that applications of other similarly situated developers received tax abatements (including the Prior Redeveloper of the Project), JSP acquiesced to Defendants' request to withdraw that application.  While the tax abatement application was put on "hold" at the request of City officials, Defendants' unwillingness to deal fairly with the application as a result of the Kushner family's relationship with President Trump was improper.

75.      It was obvious to all parties throughout 2017 that the Construction Timetable set forth in Schedule C-1, including the January 1, 2017 date for commencement of "mobilization and construction," had not been met.  All parties discussed and agreed that "reasonable adjustments" to the timetable were required, as contemplated by the express contractual provisions of the Redevelopment Agreement.

76.     At no time in 2017 did the JCRA, the City, or Fulop raise any objection to JSP regarding a failure to meet any dates set forth in Schedule C-1.  To the contrary, the parties agreed to extend the dates.  Towards that end, the parties took action to memorialize the agreement reached to adjust the dates.

77.     Throughout 2017, several draft agreements were circulated to memorialize the extensions necessitated by events beyond JSP's control, as discussed above.

78.     The parties initially conceived of entering into an "Amendment to the Redevelopment Agreement," and on February 13, 2017, counsel for JSP transmitted to the JCRA a draft amendment that reflected the parties' previous agreement that the dates on Schedule C-1, including the date by which construction was to commence, were to be extended.

79.     The next day, on February 14, 2017, the parties executed an Amended and Restated Pledge Agreement, evidencing their dealings and understanding that the January 1, 2017 date for the commencement of construction of the Project was to be extended.  The Amended and Restated Pledge Agreement revised the prior Pledge Agreement so that the $2.5 million contribution by JSP for the renovation of the Loew's Theatre would instead be deemed donated to the "Journal Square Arts Initiative."  This change provided the City with more flexibility in how to utilize those funds, which had already been transferred by JSP by March 2016.  The Amended and Restated Pledge Agreement was entered into at the specific request of the City.

80.     Following the submission by JSP's counsel of the proposed Amendment to the Redevelopment Agreement, counsel for the JCRA suggested that instead of an "amendment" to the Redevelopment Agreement, the parties should memorialize the agreed-upon revisions in the form of an "Amended and Restated Redevelopment Agreement," which JSP agreed to do.

23

81.     As further updated drafts of the Amended and Restated Redevelopment Agreement were circulated, a meeting was scheduled for September 8, 2017, to discuss same.

82.     The day before the September 8th meeting, which was two months before the mayoral elections, the JCRA canceled the meeting and then unilaterally cut off communications with JSP regarding the Amended and Restated Redevelopment Agreement, the purpose of which was simply to implement the agreement the parties had already made and under which they were already operating.

83.     Notwithstanding Defendants' sudden cessation of discussions regarding the Amended and Restated Redevelopment Agreement (and any other issues regarding the Project), it was clear to all parties that the amendment was needed simply to memorialize what the parties had already agreed to, *i.e.*, that the timetables in Schedule C-1 were unable to be met due to various issues beyond JSP's control, and that Defendants elevated their political concerns over the fact that they were required to comply with the contractual covenants.

84.     At no time throughout the entire calendar year 2017 did Defendants, or any of their representatives, even remotely suggest that JSP was in default of its obligations under the Redevelopment Agreement.  Such a position would have been ludicrous in light of Defendants' representatives' appearances before the Jersey City Planning Board to support the amended site plan application, which was not approved until November 14, 2017—seven days after Fulop's re-election.

**H.      The City Violates JSP's Contractual Rights as Redeveloper, and the Political Animus and Calculation of the City's Elected Officials**

85.     At the time of the execution of the Redevelopment Agreement in 2015, the City was supportive of, and excited to have, JSP as the new redeveloper of the Journal Square area. Indeed, Fulop had, in 2014, submitted a letter to the NJDEA in support of the Project in

connection with an application for an ERG grant. As noted above, the City was well aware that one of the principal members of JSP was the Kushner Companies, of which Jared Kushner was then CEO.

86.     However, Defendants ultimately determined to place politics over principle, their obligations under the Redevelopment Agreement, and the law, by engaging in egregious actions to interfere with JSP's ability to develop the Project following the election of President Trump, Jared Kushner's father-in-law, as president of the United States and following President Trump's appointment of Jared Kushner as a senior advisor.

87.     During 2017, Fulop and his supporters on the City Council were preparing for an election in Jersey City in November 2017.

88.     After Fulop won re-election as mayor, a meeting occurred on January 10, 2018, at Fulop's office, with various representatives of JSP who tried to determine why the Project was not moving forward despite JSP's diligent efforts. At the meeting, Fulop confirmed that, with respect to JSP's request for tax abatements, which were contemplated by the Redevelopment Agreement and the EOs, it would be "blatant discrimination" to refuse to provide tax abatements to JSP, particularly when: (a) the Prior Developer, MEPT, was granted same; (b) all other developers similarly situated were provided with such tax abatements; (c) the Redevelopment Agreement required the JCRA to cooperate in the obtaining of such abatements because they were an integral component in advancing the Project; and (d) Fulop's own EOs mandated their issuance. Fulop further confirmed during this meeting that the true motive in the denial of tax abatements to the Project was the involvement of the Kushner family, stating that it was "really tough" to move forward with the deal, and that the problem would go away if the Kushners left the deal and a new partner was brought in.

89.    To the press, Fulop candidly acknowledged the City's motivations were the function of political animus against the Kushners, and he related, in substance, that the problems moving forward with the deal would be eased if the family was no longer part of the Project.

90.    On January 24, 2018, Bloomberg published an article quoting Charles Kushner suggesting that JSP anticipated breaking ground on the Project in 2018.

91.    On that same date, after reading the article, Fulop called a member of the KABR Group, a partner with Kushner Companies in the Project, stating angrily, "what the fuck is going on with this article?"  He stated that he could not and would not support the Project.  KABR responded by telling Fulop that regardless of whether he disliked Trump and the Kushners, the Project was good for the City, and it was outrageous that Fulop would not put politics aside and do what was best for the City and comply with the Redevelopment Agreement.

92.    On the same day as his angry exchange with KABR, Fulop tweeted a link to the Bloomberg article and stated:

> I think our office/comment is 100% clear in the story.   Our position has NOT changed + we don't see support for incentives or abatements from the city for this project. . . . I suspect it's DOA. [*See* annexed Exhibit C.]

93.    Satisfied that he had sufficiently ingratiated himself with his Jersey City constituents, who overwhelmingly voted against President Trump in the 2016 presidential election, and in blatant violation of the Redevelopment Agreement, his obligations as a public official, and his own EOs, Fulop confirmed his political animus by tweeting again on February 20, 2018 that the JSP Project was "DOA."  *See* annexed Exhibit C.

94.    Fulop's attacks on JSP and the Kushner family were completely transparent, and he made no effort to mask his true motivation.  On April 17, 2018, he arrogantly tweeted that there is a "sense of entitlement that the developer has towards a subsidy."  See annexed Exhibit

C.  From this public pronouncement Fulop represented to the public the opposite of what he told JSP privately, namely that he would support tax abatements, that they were called for under the Redevelopment Agreement, and that he advised JSP that the failure to give such abatements was discriminatory because other similarly situated developers received same.  The statement also blatantly contradicted the tax abatement policies set forth in his own EOs, which required approval of tax abatement applications in connection with the development of Journal Square through the Project.  His personal attack with reference to "entitlement" was little more than political grandstanding to enhance his political prospects regardless of the truth, prior representations, his EOs, or the Redevelopment Agreement between the parties.

95.     Amidst Fulop's public attacks on JSP and the Project, and in response to the JCRA's and the City's lack of responsiveness in moving forward with the Amended and Restated Redevelopment Agreement and their failure to fulfill their obligation to JSP on a tax abatement, JSP submitted an executed version of the Amended and Restated Redevelopment Agreement to the JCRA and another tax abatement application to Fulop on April 6, 2018.

96.     The JCRA has failed and refused to sign the Amended and Restated Redevelopment Agreement, but, as discussed below, it responded by issuing the Notice of Default.

97.     With regard to the tax abatement application, Fulop was required by N.J.S.A. § 40A:20-8 to submit the application with his recommendation on it to the City Council within sixty days of the application's submission on April 6, 2018, i.e., by June 5, 2018.  Fulop has failed to do so in violation of his statutory obligations, further underscoring his obstructionist efforts against JSP in its efforts to develop the Project.

I.  **The JCRA's Frivolous Notice of Default Is a Self-Serving Pretext Orchestrated by Fulop for Political Purposes and Motivated by Political Animus**

98.     Fulop's political animus towards JSP and the Kushner family culminated in the JCRA's service of the Notice of Default to JSP on about April 17, 2018.  See annexed Exhibit D. The Notice of Default contains knowingly false statements, is nothing short of frivolous, and is a transparent pretext to enhance Fulop's status among the electorate of the City.   Fulop orchestrated the Notice of Default, conspiring with the City entities he controlled, in an attempt to push the Kushner family out of the Project, following his candid acknowledgement on January 10, 2018, that the "problems" with the Project would go away if Kushner Companies was no longer involved with JSP.

99.     The Notice of Default alleges that JSP defaulted under the Redevelopment Agreement by failing to: (1) mobilize and commence construction of Phase I of the Project on or before January 1, 2017, as set forth in the Construction Timetable on Schedule C-1; (2) submit evidence to the JCRA of firm commitments for financing and equity capital necessary to construct the Project within the Initial Contingency Period and any extensions thereof; and (3) obtain or waive the Redeveloper Contingencies within the Initial Contingency Period and any extensions thereof.

100.    Each of these claims is frivolous and legally unsupportable.

1.  Alleged Failure to Mobilize and Commence Construction by January 1, 2017

101.    The JCRA's allegation that JSP defaulted by failing to commence construction by January 1, 2017 illustrates that Defendants' true motives have nothing to do with the contractual obligations, but have everything to do with political considerations.

28

102.   As set forth above, the site plan was not finally approved by the City Planning Board until November 14, 2017, eleven months after the January 1, 2017 construction commencement date.   Final Planning Board Approval was obtained from the Hudson County Planning Board even later on February 20, 2018.

103.   As noted above, the Initial Contingency Period expires 180 days from non-appealable approval of the site plan.   Thus, the Initial Contingency Period does not expire until February 14, 2019.

104.   Step four under the Construction Timetable in Schedule C-1 requires that initial construction drawings be completed "within 90 days after expiration of the Initial Contingency Period."   Accordingly, the initial construction drawings are not even required to be prepared until May 2019.   And this assumes that the parties had not agreed to adjust the construction timetable in accordance with the Redevelopment Agreement, which they did.

105.   Any delays in commencement of construction were caused by either (a) governmental authorities requiring changes to the site plan, or (b) inaction by Defendants due to political considerations related to the re-election of Fulop.   The parties had reached an agreement, under any circumstances, to extend and adjust the construction timetable.

106.   Defendants actions in refusing to assist JSP in obtaining tax abatements and supporting PILOT and RAB applications (as contemplated by § 4.01(b) of the Redevelopment Agreement and the EOs), Fulop's statement that the abatement applications were "DOA," and the fact that the City did not "support incentives or abatements" constitute breaches of the Redevelopment Agreement, and Defendants' own policies memorialized in the EOs.

107.   Thus, the alleged default for failure to mobilize and commence construction by January 1, 2017, as set forth in the Notice of Default, is utterly meritless, in violation of the

good-faith obligations of the Redevelopment Agreement, and was motivated solely by political animus.

108.   At no time up to April 17, 2018, did any Defendant state or give notice that JSP was in default, because it would be impossible to commence construction until all approvals were obtained, as set forth in the Redevelopment Agreement.

2.   Alleged Failure to Submit Evidence of Commitments for Financing

109.   Defendants' claim in the Notice of Default that JSP failed to show evidence of firm commitments for financing before the expiration of the Initial Contingency Period or any extensions thereof in accordance with § 4.01(b) is also utterly meritless.

110.   As set forth above, the Initial Contingency Period, which is calculated as 180 days from final major site plan approval would not expire, assuming it was not extended, until February 14, 2019 – nine months *after* the date the Notice of Default was issued.  The financing commitments could be submitted any time up through that date and, even then, further adjusted as called for under the Redevelopment Agreement.

111.   Asserting this as a basis for default is an obvious pretext orchestrated by Fulop, through his appointed representatives on the JCRA, to achieve his political goal of harming the Kushner family and to curry favor with his decidedly anti-Trump electorate.

3.   Alleged Failure to Obtain or Waive Redeveloper Contingencies

112.   The JCRA's contention in the Notice of Default that JSP failed to obtain or waive the Redeveloper Contingencies on or before the expiration of the Initial Contingency Period or any extension thereof is utterly meritless.

113.   As noted above, JSP has at least until February 14, 2019, to either waive or satisfy the Redeveloper Contingencies under § 4.01(b) of the Agreement.

114.    Fulop and the other Defendants are fully aware of this fact but served the Notice of Default containing fabricated claims of default.

115.    Fulop has, under color of law, conspired with the other Defendants to orchestrate the events described in the Notice of Default, which contains false and fabricated claims of default.

116.    The issuance of the fabricated Notice of Default caused harm and damage to JSP and interfered with JSP's ability to obtain the required approvals and begin construction on the Project.  Among other things, and without limitation, the fabricated Notice of Default caused JSP's lender to serve a notice of default on a $57 million bridge loan needed to support the Project.

117.    The pronouncements of Fulop, and his subordinates, and actions taken by the JCRA, falsely conveyed the impression to the public that JSP has not honored the Redevelopment Agreement, and that they have defaulted in their obligations thereunder.  These statements by Fulop, orchestrated by him through the other Defendants, were designed to, and have in fact, caused substantial damage and irreparable harm to JSP.

118.    Thus, by declaring these fabricated failures and suspending all further cooperation, Defendants' Notice of Default had the effect of: (1) terminating the Redevelopment Agreement; (2) rendering Plaintiffs' expenditure of approximately $55 million on applications and planning worthless; and (3) blocking further construction of the Project, Plaintiffs' financing, and any further governmental approvals.  The Notice of Default resulted in wholesale obstruction of the Project.

119.    Immediately following the issuance of the Notice of Default, the *Hudson County View* published an article entitled, "JCRA says Kushner Cos. Violated their Redevelopment

31

Agreement on $800 Million Project." Eager to capitalize on the fabricated Notice of Default he

orchestrated, and desirous of brandishing the anti-Trump/Kushner bias in his political

community, Fulop sought to take credit, publishing what he told JSP back on January 10, 2018,

*i.e.*, that Kushner would be replaced with a different partner. On April 18, 2018, Fulop tweeted a

link to the article and stated:

> Last night the Jersey City Redevelopment Agency defaulted
> Kushner/KABR on their Redeveloper Agreement w/#Jersey City -
> it's important as we're tired of the delays - **hopefully this will now
> move to a different partner that can complete the project**.  [See
> annexed Exhibit C (emphasis added).]

**J.     Fulop Confirms His Bias against JSP**

120.    On June 27, 2018, JSP filed the initial Complaint in this matter.  Fulop wasted no

time in responding with further false public statements reflecting his blatant bias towards JSP.

On the same day the Complaint was filed, Fulop posted on Twitter a link to a news article

discussing the lawsuit, and made the following false statement concerning JSP:

> Nonsense. Bottom line: the same way **they illegally try to use the
> presidency to make $** when it suits them is the same way here
> where they try to use the presidency to be pretend victims when
> that suits them. Lawsuit = they will say/do anything to make $.
> [See annexed Exhibit C (emphasis added).]

121.    According to news reports, Fulop also stated in an email to reporters on or about

June 28, 2018 the following false statement:

> It's not like the Kushners have a great deal of credibility in
> anything they say.   Their entire lawsuit is hearsay nonsense.
> Bottom line – the same way **they illegally use the presidency to
> make money** is the same way here they try to use the presidency
> to be pretend victims.   They will do anything to manipulate a
> situation.

122.    These statements were false and utterly without merit, and JSP immediately

demanded that Fulop retract the statements and cease and desist from making further such

statements.  Instead, Fulop doubled down, posting the cease and desist letter to Twitter on June

29, 2018, and stating:

> I got another letter from the Kushner family today threatening to
> sue me AGAIN.  They demand an apology for saying the truth +
> they even drafted a tweet for me to send out.  It's not going to
> happen.  I'll revise my tweet slightly when THEY apologize
> publicly (maybe) . . . . I'm not going to apologize for saying the
> truth.   Whether it's **inaccurately reporting ownership in**
> **properties, or misrepresenting $ partners, or outright saying in**
> **China that $ in Jersey City properties means lots to the the**
> **family**, I think the public can judge 4 themselves[.]  [See annexed
> Exhibit C (emphasis added).]

123.     These utterly false statements confirm that Fulop, and the City and the JCRA,

which Fulop controls, have an improper bias against JSP and have acted in violation of the law to

deprive JSP of its property rights to develop the Project.

124.     In addition to these false statements, Fulop has also made recent public comments

suggesting a shift in the City's tax abatement policies.  These statements transparently seek to

create a pretense for Defendants' continued opposition to JSP's request for tax abatements.

125.     Specifically, on July 17, 2018, Fulop tweeted that the City had not "considered

any market rate tax abatements" for over a year, and that the City was both "incentiviz[ing]

growth away from [the Jersey City] waterfront [and] gradually phas[ing] out the past structure of

tax abatements."  On August 2, 2018, he tweeted that he was "phasing [tax abatements] out," and

on August 6, 2018, he tweeted that "[w]e've been phasing out long term tax abatements."  See

annexed Exhibit C.

126.     Notwithstanding these statements, Fulop's Executive Order 2015-007, which

requires mayoral approval of tax abatement applications made in accordance with the policies

therein, still remains in effect.  Under that policy, JSP's tax abatement application should have

been approved long ago.  Fulop's exercise of final policy-making authority to indefinitely delay

submission of Plaintiffs' tax abatement application deprived Plaintiffs of approval of the tax abatements all parties understood would be issued, a fair evaluation of the application, and the ability to obtain other financing in the event of a timely denial.

127.    These statements, actions, and failures to act constitute direct evidence of the Mayor's retaliatory intent and further underscore the ample additional prior evidence of the Mayor's political animus against the Kushners and the Project as a result of Jared Kushner's appointment to the Trump White House.

128.    Indeed, as set forth above, the Mayor and other City officials repeatedly stated that the reason for delaying, attacking, and effectively terminating the Project was because the Kushner Companies' CEO joined the Trump Administration.

129.    For example, in early 2017, Deputy Mayor Marcos Vigil told JSP there was no way the Fulop Administration could be seen supporting the Kushner Companies' Project because of the current political atmosphere leading up to the mayoral election.  The Deputy Mayor was referring to the local unpopularity of the Kushners' relationship to newly-elected President Trump.

130.    At the time of "Evict Kushner Trump" protest in front of the Kushner Companies' property, a Jersey City official expressly declared the City would "prevent[] Trump and Kushner from profiting off of a community they feel the president is currently attacking" and a councilmember declared "he wouldn't be supporting any tax breaks for Kushner or Donald Trump."

131.    When asked about the rally to "evict" Kushner Companies, the Mayor's office explicitly tied his position on Kushner Companies to his opposition to President Trump, stating: Fulop "was on record and has been extremely vocal against President Trump's actions."

132.    Similarly, on May 16, 2017, when a reporter writing an article entitled "Fulop Distances Himself From Kushner" asked about Fulop's Twitter post—that "[his] administration made clear to the applicant that the city is not supportive of their request"—Fulop frankly explained his opposition: "our record has been very clear, during the year, opposing the president's agenda."

133.    Fulop's office immediately contacted JSP and requested they withdraw their application, citing the harmful media attention linking him to Trump through Kushner Companies during the re-election campaign.

134.    Perhaps the bluntest admission of the City's political animus was stated by Councilman Yun, who summarized the City's opposition to JSP as follows: "It's a good project, and if it weren't for the Trump connection" it would be approved.

135.    Finally, in January 2018, shortly before Fulop ordered the Project to be improperly defaulted, Fulop admitted that the City's conduct over the past year was "clearly just blatant discrimination against because your former CEO works in the Trump Administration." Despite the fact that the City's conduct was "wrong," Fulop stated that the publicity over the fact that he was linked to Trump through the Kushner Companies made the deal "really tough," such that it would be better if the Kushner name was not involved in the Project.

136.    Days later, when the press reported the meeting between Kushner and Fulop, Fulop called JSP leadership stating he could not support a Project where he was continually tied to Trump, and that he simply could not put Kushner Companies' connection to Trump aside.

137.    Fulop repeatedly and expressly admitted that his public opposition to the Project was motivated by his position "against President Trump's actions" and because of Kushner Companies' "connection to Trump."

35

138.    These actions and statements by Fulop and other City representatives, admitting they were motivated by Kushner Companies' protected conduct to take retaliatory action, is direct evidence that Defendants' political animus caused JSP harm including the issuance of the improper Notice of Default.

**K.     JSP Files a Notice under the Tort Claims Act with the City**

139.    Based on the facts alleged above, JSP timely filed a notice of claim for damages against Defendants in accordance with the New Jersey Tort Claims Act on July 16, 2018.  In the notice, JSP advised the City of, among other things, its claim against Fulop and the City for tortious interference with the contractual relationship between the JCRA and JSP by directing the JCRA to issue the Notice of Default on April 17, 2018.   JSP's notice complied with the requirements of the New Jersey Tort Claims Act.

**L.     Defendants' Changed Demeanor and Pattern of Antagonism Against JSP Following Jared Kushner's Appointment To The White House Demonstrate a Causal Link Between Plaintiffs' Protected Conduct and Defendants' Retaliation.**

**1.     Defendants' Demeanor and Conduct Toward Plaintiffs Changed Significantly Following President Trump's Election**

140.    The demeanor and conduct of Mayor Fulop and the City employees he controls changed immediately after Jared Kushner joined the Trump Administration following Trump's surprise victory in 2016.  Although the Kushners' political relationship with Mr. Trump predated the November 2016 election, Defendants, as well as most pundits in the media, did not predict that Trump would actually win the election.  Therefore, there was no need for Defendants to retaliate against JSP for a political affiliation that, in Defendants' view, would be moot by the time the Mayoral election cycle began.

36

141.    Before Jared Kushner left Kushner Companies and joined his father-in-law's administration, Fulop and his top deputies had a supportive and cordial relationship with the senior executives at Kushner Companies, whom Fulop himself described as terrific friends, partners in the City's growth, and advocates for change in the best interests of Jersey City. Indeed, Fulop described Jared Kushner as "brilliant" in emails.

142.    Kushner Companies had multiple redevelopment projects in different stages throughout Jersey City, and Fulop was quick to take credit for propelling the projects forward, lending the support and resources of his administration to speed the developments, which he described as exciting additions to draw investment in the City.

143.    During the three years before Jared Kushner joined the Trump administration—an administration which Jersey City's progressive electorate quickly came to view as toxic—Kushner Companies' executives had a close relationship with open lines of communication to Fulop's administration, including hosting dinners and events with the Mayor, with Fulop appearing at regular milestones at Kushner Companies' redevelopment projects.

144.    With respect to the Project, in the six months leading up to Jared Kushner's appointment to his father-in-law's administration, Fulop's deputies had worked cooperatively with the Kushner Companies on revisions to the timetables for the Project and Pledge Agreement to accommodate unforeseen demands by other entities. Indeed, at Kushner Companies' request, they were granted multiple meetings in October 2016 with Fulop's deputies to attempt to move the Project forward.

145.    From at least 2014, when Fulop sent a letter to the State praising the project, until weeks before the Presidential Election when a Fulop deputy publicly endorsed the Project, Fulop

consistently supported Kushner Companies' redevelopment efforts in Jersey City more broadly, and the Project specifically.

146. But immediately after Jared Kushner joined the incoming Trump administration, Defendants' demeanor and conduct changed entirely.

147. In the weeks after the election, for example, Kushner Companies' executives' emails and phone calls would go unanswered and scheduled meetings between the Kushner Companies and the City were cancelled.

148. No longer cordial or supportive, Fulop and his administration repeatedly attacked the Kushner Companies in the press and refused to appear at any Kushner Companies' properties.

149. With respect to the Project, when Kushner Companies circulated an Amended Redevelopment Agreement embodying the changes the City had previously endorsed, Fulop's deputies delayed, feigned objections, and inaccurately claimed that no agreement was reached.

150. Fulop's and the City's actions and stark change in demeanor and conduct from consistently championing Kushner Companies' projects during the three years before Jared Kushner joined the Trump Administration, to then cutting off communication with the Kushner Companies and JSP and attacking the Project, were directly caused by Kushner Companies' and JSP's protected conduct with respect to President Trump's election and the Mayor's perceived self-benefit in  demonstrating political animus toward President Trump and anyone associated with the new Administration.

### 2. Defendants Exhibited A Pattern Of Antagonism and Animosity Against Plaintiffs Following The Kushners' Support For The New Trump Administration.

151. Similarly, Mayor Fulop and the City also exhibited a pattern of antagonism and animosity against Plaintiffs following Jared Kushner's appointment to the Trump White House.

152.    After Jared Kushner took a position in the Trump Administration in January 2017, during a Mayoral election year with an unequivocally anti-Trump electorate, Fulop chose to extract political gain by publicly demonstrating he was hostile to Trump and those associated with him. This demonstration included Fulop attacking and otherwise harming Kushner Companies' interests, amounting to a pattern of antagonism culminating with the Notice of Default for the Project.

153.    Fulop announced that he would be running for re-election on September 28, 2016, and by January 2017, William Matsikoudis had entered the race challenging Fulop.

154.    During Fulop's re-election campaign, in the months following Jared Kushner joining the Trump Administration, Fulop was repeatedly hammered in the press and by his election opponent for his ties to the Trump Administration through the Kushner Companies, as set forth in detail below.

155.    Two weeks after Jared Kushner was named senior advisor to President Trump, on January 27, 2017, Bloomberg reported on links between Fulop and Kushner Companies, claiming that doing business with Kushner Companies was a "road to the Trump Administration." It reported that "both Jared and his father have a close relationship with Mayor Steve Fulop"; that Fulop received "glowing coverage" from the Kushner-owned Observer; that Kushner Companies hired Fulop's chief strategist; and that Kushner Companies were "major financial backers" of Fulop, who had reportedly accepted a $100,000 donation from Kushner Companies—which Fulop was forced to return after a public outcry.

156.    Various local news outlets followed up on the Bloomberg report, publishing stories regarding Fulop's claimed "Kushner Ties"; their "cozy relationship"; Nicole Meyer Kushner's reported donations to Fulop-linked organizations; Charles Kushner's reported

financial support of Fulop's contemplated gubernatorial run; Fulop's hiring of Kushner Companies' publicist; private dinners between Fulop and Kushner Company executives; and a claimed "decades-long" friendship between Fulop and members of the Kushner family.

157.     Building on the hostility for Trump and Kushner in Jersey City following the election and the press coverage linking Fulop to Trump through Kushner Companies, candidate James Solomon kicked off a successful campaign for Jersey City Council as organizer of the pressure group "Evict Trump-Kushner."

158.     Solomon issued a February 16, 2017 "Petition to Mayor Steven Fulop to Evict" Kushner Companies from the Project, which collected hundreds of signatures, denouncing the "destructive policies target[ing] Muslims, immigrants" by "Donald Trump and his son-in-law Jared Kushner," and demanding Fulop "send Trump and Kushner a clear message: If you attack our community, you should not profit off of it. . . [We] call upon Jersey City Mayor Steven Fulop and members of the City Council to refuse any tax breaks for Donald Trump and Jared Kushner's real estate companies," specifically identifying the "developments at 1 Journal Square."

159.     Council candidate Solomon organized an "Evict Trump Kushner Boycott Rally" on February 18, 2017, with over one hundred attendees, expressly focused on stopping Trump's son-in-law and adviser Jared Kushner from "profit[ing] off of" Jersey City while supporting an administration that "target[s] illegal immigration and refugees from Muslim-majority countries."

160.     Organizers called the boycott of Kushner Companies' properties "a way of sending a message to the president and to Jersey City."

161.     Although at the time, President Trump had no financial interest in the Kushner Companies' Jersey City developments, protestors treated the developments as a proxy for

Trump, parading in front of Kushner Companies' property with placards containing anti-Trump slogans and chanting "No respect, no profit."

162.    At another "Evict Trump Kushner" rally on March 23, 2017, organized by candidate Solomon on the steps of City Hall, Solomon criticized Fulop for his history of tax breaks to Kushner Companies because it helped Trump's family when Trump's policies adversely affect the "large number of immigrants and Muslims who live here."

163.    Solomon urged each candidate for Mayor and the Council to join his pledge that no tax breaks would go to Kushner's or Donald Trump's companies.

164.    Candidate Solomon's protests linking Fulop to Kushner and Trump had a negative effect on the press coverage of Fulop's re-election campaign.  For example, articles noted that Fulop, a "Democrat running for reelection this November, has been criticized for his warm relations with both Jared Kushner and his father, Charles, chairman of the family's real-estate ventures."

165.    Bloomberg questioned whether Fulop's campaign could survive the backlash regarding Fulop's unpopular connections to Kushner in "Jersey City, a liberal Democratic stronghold," where "Kushner Cos.' close connections to Trump have sparked protests, causing problems for its projects in the community and complications for Fulop."

166.    The Jersey Journal reported that candidate Solomon's protests had "hammered the [Fulop] administration over Kushner" and Fulop's "troubling" and "extraordinarily cozy relationship" with Kushner Companies, resulting in "intense scrutiny of any Jersey City deal involving Trump's son-in-law."

167.    Fulop's re-election challenger Matsikoudis and his supporters made Fulop's ties to Kushner Companies and the Trump Administration the heart of an attack on Fulop as a fair-

weather Democrat at ease mingling with right-wing conservatives, wholly out of place in a progressive stronghold.

168.   The press noted "Fulop's critics have seized on his relationship with Kushner, sensing a vulnerability they can exploit" by linking Fulop to Trump and the policies many Jersey City voters despised.

169.   The Jersey City Democratic Organization put out a press release withholding funds from Fulop's re-election campaign because "we do not want JCDO dollars spent on a . . . Republican sympathizer like Steve Fulop," citing the report that "Steve Fulop's SuperPac received a $100,000 secret contribution from Donald Trump's close adviser and son-in-law Jared Kushner."

170.   Democratic officials claimed that Fulop "has not proven himself to be a real Democrat." Under this pressure, several Councilmembers took Solomon's pledge that they "wouldn't be supporting any tax breaks for Jared Kushner or Donald Trump," including City Councilman Michael Yun.

171.   Fulop's opponent Matsikoudis branded Kushner Companies "Fulop's political patrons," a fact that he claimed Fulop was trying to hide because Fulop's connection to Kushner and Trump was "a huge liability in the upcoming election."

172.   In an interview, Matsikoudis claimed it was "100% corrupt" for Fulop to accept a "secret campaign contribution" from Jared Kushner, his "personal friend," noting "Trump is toxic in Jersey City."

173.   Throughout the 2017 Jersey City campaigns, Fulop understood Jersey City's electorate was closely attuned to, and hostile towards, Kushner Companies because its former CEO joined his father-in-law, President Trump.

174.   Fulop also recognized that he was getting "hammered" in the press for his "cozy relationship" with Kushner Companies; pressure groups were drawing support for a petition to Fulop to "evict" Kushner Companies from the Project because of the link to the Trump Administration; and his political opponents were gaining ground with the campaign that Fulop was a "Republican sympathizer" with "secret" ties to "toxic" Trump.

175.   Fulop chose to respond by demonstrating his progressive bona fides through public attacks on Kushner Companies and private efforts to delay the Project so Fulop could avoid the perceived negative optics of partnering with Kushner Companies.

176.   For example, in early January 2017, around the time that Bloomberg published its post-election January 27, 2017 report regarding Jared Kushner's "close relationship with Mayor Steven Fulop," Hudson County View reported on the $100,000 donation to a Fulop-linked organization, and now-Councilman Solomon created his February 16, 2017 petition to Fulop to "Evict Kushner Trump," Deputy Mayor Marcos Vigil contacted Kushner Companies by telephone.

177.   As set forth above, it was around this time that the Deputy Mayor told Kushner Companies there was no way the Fulop Administration could be seen supporting the Kushner Companies' project in this atmosphere, particularly leading up to the mayoral election, and the application would have to be delayed until after the November 2017 vote.

178.   Additionally, since June 2016, JSP had been working with the City to revise the timetable for the Project in light of additional demands by other entities and to loosen the restrictions on the City's use of the $2.5 million pledge made by JSP to renovate Loew's Theater.

179.   In February 2017, that cooperation came to a halt.

180.    On February 14, 2017 JSP requested the City reduce the existing commitments to writing in an Amendment to the Redevelopment Agreement with JSP. But later that same week, candidate Solomon held an "Evict Trump Kushner Boycott Rally" on February 18, 2017, in front of Kushner Companies' property, demanding that "Trump son-in-law and adviser Jared Kushner, who ran the real-estate development firm partially behind the new luxury tower, should not profit off of Jersey City."

181.    When asked about the "Evict Trump-Kushner" and pledge to "refuse any tax break requests," the Mayor's office responded by assuring the activists that the "mayor is on record and has been extremely vocal against President Trump's actions."

182.    At the rally, a City official repeated that the City would prevent "Trump and Kushner from profiting off of a community [we] feel the president is currently attacking."

183.    At around this time, as set forth above, JSP had been repeatedly sending the draft Amendment for the Redevelopment Agreement to the City regarding the agreed-upon construction timeline, but the City failed to respond.

184.    Finally, on March 23, 2017, the same day as candidate Solomon's second Evict Trump Kushner rally at City Hall, the City responded to an JSP email from weeks before by stalling, noting the "Amendment [is] in draft form" that is still "under review."

185.    The City remained silent for more than a month.

186.    After the political rhetoric had cooled, JSP followed up again on May 3, 2017.

187.    The City ignored JSP's May 3, 2017 request.

188.    In contrast to the substantial back-and-forth and cooperation before the presidential election, the City was non-responsive and evasive; however, at this point no one had even hinted that the Project was in jeopardy rather than merely delayed.

189.     Three days later, on May 6, 2017, the New York Times reported that Kushner Companies' executive Nicole Meyer Kushner "made a pitch to attract $150 million in financing for a Jersey City housing development, known as One Journal Square, to more than 100 Chinese investors," with the article claiming she highlighted "her brother's service as chief executive of Kushner Companies and the family business from which he resigned in January, saying he had left to serve in the Trump administration."

190.     Local media quickly linked the story to Fulop's re-election campaign, with Hudson County View characterizing it as another instance where "Kushner's ties to Jersey City have given the Fulop administration headaches," and rehashing the months' old stories regarding the "Evict Trump-Kushner" rallies and the "$100,000 donation . . . linked to Fulop's potential run for governor."

191.     Faced with yet another newspaper article linking Kushner Companies, Trump, and Fulop together in a mayoral campaign that was heating up, Fulop posted on Twitter on May 7, 2017, that JSP's "tax abatement application doesn't work for us."

192.     Although no one from his administration had set forth the position previously, instead repeatedly delaying consideration of the tax abatements, Fulop falsely claimed that the City had already told JSP it did not support the project:

> The administration made clear to the applicant that the city is not supportive of their request and while the law requires a first reading ordinance vote if they submit an application, I don't foresee the council voting in favor.  I know for certain I have made my feelings clear here on this project and what I feel works best for jersey City.  This tax abatement application doesn't work for us.

193.     Interviewed by the New York Times for a follow-up story, Fulop's election opponent, Matsikoudis, seized the opportunity to paint Fulop's newfound position as insincere, declaring the flip-flop was "100 percent political," a feigned attempt to "throw a bone to the

45

progressive, very anti-Trump people in Jersey City" despite the fact that he "could not recall a request for a large tax abatement being turned down" by Fulop.

194.    When Fulop was asked by the New York Times for his reasoning for the about-face, he "declined to comment," leaving the paper to infer that the explanation was Kushner Companies' "involvement in the project [that] has stirred up opposition among liberal and progressive residents of Jersey City who are critical of Mr. Trump's policies" with "critics of the mayor charg[ing] this week that the opposition to the tax break was aimed at appeasing liberals who disapprove of Mr. Trump."

195.    Bloomberg pointed out the stark contrast between Fulop's glowing letter to the state supporting the Project and his recent public opposition now that Fulop was campaigning for re-election.

196.    Similarly, Councilman Yun went on to clarify the administration's objection to the Project was purely because Kushner Companies' CEO joined his father-in-law, stating to the press: "It's a good project, and if it weren't for the Trump connection" it would be approved.

197.    Later that month, JSP's application was set to be heard by the City Council on May 24, 2017.

198.    The week before, on May 16, 2017, the Jersey Journal published a lengthy investigative report "Fulop Distances Himself From Kushner as Mayor's Race Nears." The article contains a series of photographs of Jared Kushner and Mayor Fulop at various development sites, quoting Fulop as saying they have a "terrific friendship." The article went on to report:

> Three years and one stunning presidential race later, Fulop, a Democrat seeking reelection in this liberal bastion where President Trump's name is nearly an expletive, is sprinting away from his connection to Kushner, Trump's son-in-law and senior adviser.

> The mayor last week said he will not support a critical tax break that Kushner's family requested for their One Journal Square project; denied knowledge of a $10,000 donation to the Hudson County Democratic Organization that Kushner's sister and her husband made three months before that project was announced; and responded to inquiries about the Kushners with statements stressing his opposition to Trump. Experts say they are not surprised Fulop is distancing himself from Kushner. In this city of 136,000 registered voters, Trump received 11,705 votes in November. A Fairleigh Dickinson University PublicMind poll from March found Trump's disapproval among New Jersey Democrats was 88 percent.

199.    When asked about his position regarding the Kushner Companies for the article, Fulop's spokesperson responded by tying Fulop's opposition to the Project to his political disdain for the Trump Administration: "I think our record has been very clear, during the year, opposing the president's agenda." He categorically denied the report that Fulop requested the donations from the Kushners and falsely claimed he never had any private meetings with Jared Kushner.

200.    Bloomberg published an article on May 18 noting Fulop's "warm relations" with Kushner Companies and how it was "causing problems for its projects in the community and complications for Fulop," reporting that the opposition to Kushner Companies' Project was "a political reaction to an unpopular president."

201.    The day after the Jersey Journal article delving into Fulop's "Kushner Ties" was published, the City contacted JSP, requesting they adjourn the tax abatement application.

202.    Several days later, the City asked JSP to withdraw their application entirely because of the media attention to the application which had tied Fulop to Kushner Companies and Trump, and harmed Fulop's reelection campaign.

203.    JSP withdrew the application on May 31, 2017.

204.    Over the next several months, in a half dozen emails, JSP repeatedly attempted to secure an executed Amendment to the Redevelopment Agreement to reduce to writing the previously-agreed upon timetables and to avoid further delays, but received either no response from the City or attempts to stall.

205.    JSP requested a meeting, which was scheduled for September 8, 2017.  But at the last moment the meeting was "rescheduled" by the City without a new date being proposed.

206.    In the 2017 Jersey City election, Fulop was re-elected and Solomon, leader of the "Evict Trump Kushner" movement, defeated Fulop's ally Rebecca Symes.

207.    Hopeful of moving forward with the Project now that the election and coverage had passed, JSP's senior leadership met with Fulop on January 10, 2018.

208.    Referencing the impact of the activists' rhetoric and press attacks, and in stark contrast to his position prior to the mayoral campaign, Fulop now told JSP that moving forward with "this deal is really tough."

209.    Fulop told Charles Kushner that, unlike the other partners in JSP, the Kushner name in this electoral climate made the political optics difficult for Fulop to convey support like he did in 2016 before the presidential election.

210.    Fulop admitted that the City's conduct over the past year was "clearly just blatant discrimination against you because your former CEO works in the Trump Administration."  He added that what the City was "doing is wrong" and could not be defended.

211.    As an illustration, Fulop turned to his corporation counsel and asked about recent litigation in which they had suffered a loss regarding political discrimination.  Notably, at this time, the City was about to begin a trial in *Montone v. Jersey City*, 2:06-cv-00280-SRC-CLW, having lost an effort to sustain a summary judgment order before the Third Circuit in a case

alleging a Jersey City police officer had been politically retaliated against for her support of a losing mayoral candidate.

212.     Fulop ended the meeting by stating that he could move forward with the Project if JSP met with certain councilmembers and convinced them not to attack Fulop for his support of the Project.

213.     On January 24, 2018, Bloomberg published an article "Elder Kushner Met with N.J. Mayor, Sees 2018 Groundbreaking," reporting on the meeting.  It stated that "Fulop and Charlie Kushner are old allies whose relationship was damaged by Trump's ascent to the White House," noting that Fulop had previously done an "about-face" retracting his support for the Project "during his re-election campaign" in light of the fact that "Jersey City is fiercely liberal and voted overwhelmingly for Hillary Clinton over Trump in 2016."

214.     For the article, Bloomberg interviewed Fulop's unsuccessful challenger Matsikoudis, who claimed that Fulop "created an uproar over his opposition to the previous Kushner abatement application . . . in a political atmosphere and it served Fulop's interest," but now that the election was over, "[a]s I predicted, Kushner will get an abatement."

215.     Before JSP leadership had even seen the article, Fulop immediately called them, exclaiming "what the fuck is going on with this article?"

216.     Fulop complained that every time he moved forward with the Project, he was hit with a storm of accusations that he was helping Trump, and that he could not support a Project under these circumstances.

217.     JSP responded that Fulop should just explain that he hates Trump, but that the Project should go forward because it is good for Jersey City.

49

218.   Fulop replied that he wished it were that easy, but he could not simply put Kushner Companies' connection to Trump aside.

219.   Later that day, Fulop tweeted regarding the Project, revoking his agreement with JSP to continue advocating for the project: "Our position has NOT changed + we don't see support for incentives or abatements from the city for this project. . . I suspect it's DOA."

220.   Fulop recognized that regardless of whether the election was over, he would face national press coverage and attacks by political opponents for any action that helped Kushner Companies because of its well-known link to Donald Trump.

221.   Even though he had won the mayoral election that year, any ongoing support for Trump or the Kushners – or, by association, the Project – would continue to remain a personal liability for Fulop, who has well-known aspirations for higher office.

222.   Because Kushner Companies' CEO supported and joined his father-in-law's administration, Fulop chose to effectively terminate the Project.

223.   However, Defendants used the negotiations on the Amended and Restated Redevelopment Agreement, among other things, as a delay tactic in the hope that JSP would either abandon the Project and/or give up on tax abatements following Defendants' retaliatory lack of cooperation and concerted campaign of public criticism.  However, when JSP submitted an executed version of the Amended and Restated Redevelopment Agreement to the JCRA and renewed their application to Fulop for tax abatements on April 6, 2018, Defendants' hands were forced to finally reveal their retaliation in writing.  Accordingly, the JCRA, at Fulop's direction, issued a premature Notice of Default to JSP on April 17, 2018 to allow the JCRA to avoid signing the Amended and Restated Redevelopment Agreement and to relieve Fulop from his

mandatory obligation to publicly recommend JSP's tax abatements to the City Council as required by his own Ordinance.

224.    The City's delays and Fulop's attacks on the Project, which directly coincided with any press coverage or campaign statement tying Fulop to Trump through Kushner Companies, provides evidence of a pattern of antagonism and political animus linking Fulop's ultimate retaliation to Kushner Companies' protected activity.

**M.    Defendants' Actions Against the Project Are Merely A Pretext For Their Political Retaliation Against JSP.**

225.    Beginning in 2017, after Jared Kusher left Kushner Companies for the Trump Administration, Defendants reversed course by opposing tax abatements for the Project, expressing their desire to extricate Kushner Companies from the Project and ultimately issuing a Notice of Default.

226.    The newfound opposition was in stark contrast to the period prior, when Defendants actively courted Kushner Companies to take over the Project, promised tax abatements and other incentives, and encouraged a working relationship with Kushner Companies on Loew's Theater and other projects in the City.

227.    Defendants' departures from their prior conduct also significantly deviated from their usual and ordinary procedures.  Indeed, Fulop's refusal to report a recommendation to the City Council concerning JSP's tax abatement application violated his own Executive Orders.

228.    For the last decade, the City has acted consistent with the policies of the 2060 Redevelopment Plan and the Executive Orders to draw investment and developers to the Journal Square area.

229.    EO 2013-004 states that tax abatements would not be routinely issued for projects along the Jersey City waterfront, as they previously had been, but instead would "be utilized to

support and encourage development in other areas of the City, including but not limited to, Journal Square[.]"

230.    Under that policy, Journal Square was deemed an area "most in need of development." The policy states that, provided an application for tax abatements complied with EO 2013-004's guidelines, it "shall receive Mayoral recommendation and should be approved by the Council."

231.    Fulop's claim that he and the City disfavored JSP's tax abatement request because of their tax abatement policy is actually refuted by the language of the policy itself, which still remains in effect today.

232.    The grounds for the Notice of Default were similarly pretextual. The April 2018 Notice claimed that JSP had missed the January 2017 deadline for the commencement of construction, which was untrue for the reasons set forth in Section "I" above.

233.    However, that basis was not plausible because the City never raised this purported "deadline" during the prior six months of cooperation regarding the construction schedule.

234.    Nor did the City or JCRA raise concerns about the construction start date as a determinative factor preventing negotiation of the Amended and Restated Redevelopment Agreement. To the contrary, the JCRA and JSP exchanged several drafts of that document until Fulop secretly instructed JCRA to cease communications with JSP. Indeed, JCRA was also aware all along of the deadline delays attributable to obtaining the FAA and Port Authority approvals, among other things.

235.    More importantly, however, the Redevelopment Agreement itself provided a 180-day period following JSP obtaining appealable final governmental approval, plus automatic

extensions, yielding a deadline of no earlier than February 14, 2019, which was still ten months after the Notice of Default.

236.    Similarly pretextual was the Notice's claim of "delay," because Fulop, the Deputy Mayor and other City officials had repeatedly and expressly requested that JSP temporarily withdraw or delay submission of its tax abatement applications due to political timing and optics.

237.    Finally, the Project was effectively terminated under unusual circumstances.  In his May 7, 2017 Twitter post, Fulop correctly admitted that the "law requires a first reading ordinance vote if they submit an application."  Indeed, the Mayor is required by ordinance to act on an application within 60 days.  His own executive order, EO 2015-007, provides that if the application complies with the City's policies, it "shall receive Mayoral recommendation and should be approved by the Council."

238.    However, Mayor Fulop never even submitted any recommendation to the Council despite the 60 day deadline.  Upon information and belief, it is the first time that the Mayor has failed even to act on an application, particularly one that met all requirements.  Similarly, never before has the City defaulted a redeveloper, especially one who has obtained all governmental approvals for construction.

239.    The fact that Fulop's statements and actions contradict both his own Executive Orders as well as his conduct toward JSP prior to Trump's election, that the delays complained of in the Notice of Default were known to, and in part were created by, the City and Fulop, and that the procedure used to effectively terminate the Project was unprecedented and unusual, all indicate that the delay cited in the pretextual Notice of Default was a sham designed to cover up Fulop's true motivation for opposing and  terminating the Project based on JSP's and its former CEO's protected conduct.

## FIRST COUNT
### (Breach of Contract)

240.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

241.    As set forth above, the JCRA and JSP are parties to the Redevelopment Agreement.

242.    As set forth in the Redevelopment Agreement, the JCRA acted as an instrumentality of the City and acted on behalf of, and at the direction of, the City and its representatives at all relevant times with respect to the execution, amendment, and performance of the Redevelopment Agreement.

243.    As set forth above, JSP has performed its obligations diligently and in good faith, as evidenced by its expenditure of $55 million in acquisition and development costs.

244.    The Redevelopment Agreement was amended by agreement of the parties with respect to the timetable for performance of the obligations under Schedule C-1. As contemplated by the Redevelopment Agreement, a variety of events beyond JSP's control, outlined above, prompted the extension of the Construction Timetable, including the necessity to amend the site plan in response to objections by the FAA and the Port Authority, and delays caused by Defendants for political considerations.

245.    The Redevelopment Agreement contained provisions, including §§ 3.01, 4.01, and 4.02, and Schedule C-1, that required the parties to act in good faith to extend the Project timelines as necessary.

246.    On April 17, 2018, Defendants caused to be issued the Notice of Default, which is little more than a transparent attempt by Defendants to interfere with and impair JSP's contractual and property rights in the Project.

247.    The actions of Defendants are in breach of the Redevelopment Agreement, in its original form, and as amended by the parties.  Defendants' wrongful conduct includes, among other things, the following actions:

A.    Issuance of the frivolous Notice of Default contending that the timetables under the Redevelopment Agreement have not been met;

B.    After agreeing to adjust the construction timetable in Schedule C-1, failing to execute the Amended and Restated Redevelopment Agreement prepared to memorialize that agreement;

C.    Repudiating its obligation to cooperate with and facilitate the obtaining of tax abatements and other quasi-governmental financing required under the Redevelopment Agreement;

D.    Making public statements conveying the false impression that JSP had not honored the Redevelopment Agreement, to the effect of interfering with JSP's financing and resulting in, among other things, JSP's lender serving a letter of default regarding a $57 million bridge loan.

248.    The actions of Defendants have delayed JSP's ability to move forward and complete the Project and have caused substantial damage.

249.    As a direct and proximate result of this conduct, JSP has suffered damages in an amount currently estimated at $300 million, together with costs, expenses, and reasonable attorneys' fees.

250.    The subject matter of the Redevelopment Agreement is unique, thus entitling JSP to an Order compelling Defendants to specifically perform their obligations under the Redevelopment Agreement.

251.     There exists a justiciable controversy between the parties to warrant the issuance of a declaratory judgment from the Court that JSP is not in breach of the Redevelopment Agreement as alleged in the Notice of Default.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.     Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.     Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.     Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extensions pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.     Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.     Compensatory damages;

F.     Attorneys' fees and costs of suit; and

G.     Such other and further relief as the Court may deem equitable and just.

## SECOND COUNT
### (Breach of Cooperation Covenant)

252.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

253.     As set forth above, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1 of the Redevelopment Agreement impose express contractual obligations upon Defendants to fully cooperate with JSP regarding adjustments to the timetables for obtaining Governmental Approvals, and securing private financing and governmental and quasi-governmental financing for commencement of construction.

254.     Defendants have breached the express covenants of cooperation by failing to cooperate and issuing the frivolous Notice of Default, which has had the effect of interfering with and impeding JSP's ability to commence with development of the Project, as it illegally and improperly created uncertainty in the public's mind regarding JSP's status as the redeveloper of the Project.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.     Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.     Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.     Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance

with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

> D.      Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

> E.      Compensatory damages;

> F.      Attorneys' fees and costs of suit; and

> G.      Such other and further relief as the Court may deem equitable and just.

### THIRD COUNT
**(Breach of Covenant of Good Faith and Fair Dealing)**

255.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

256.    There is implied, as a matter of law, a covenant of good faith and fair dealing in the Redevelopment Agreement, and the amendments thereto, to the same extent as if same were expressly set forth therein, mandating that Defendants deal with JSP with the utmost good faith and honesty and not engage in any act that would have the effect of depriving JSP of the fruits of the Redevelopment Agreement.

257.    By virtue of the conduct of Defendants, as set forth in detail above, they have violated the covenant of good faith and fair dealing.

258.    By virtue of the foregoing, JSP has suffered and will continue to suffer irreparable harm and damage.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.      Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.      Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.      Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.      Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.      Compensatory damages;

F.      Attorneys' fees and costs of suit; and

G.      Such other and further relief as the Court may deem equitable and just.

### FOURTH COUNT
### (Promissory Estoppel)

259.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

260.    In April 2015, Defendants made promises to JSP that they would cooperate with JSP in its efforts to develop the Project and would not unreasonably withhold consent to

adjustments of the time periods for obtaining Governmental Approvals, financing and commencement of construction.

261.     Subsequent thereto, as JSP diligently proceeded forward to perform, although the Redevelopment Agreement provided a January 1, 2017 construction commencement date, Defendants made further promises and assurances to JSP that they would agree to adjustments to the Project timeline due to a variety of issues beyond JSP's control, which made commencement of construction by January 1, 2017 impossible.

262.     Defendants repeatedly assured JSP not to be concerned about the January 1, 2017 date and the parties circulated written agreements to memorialize their understanding that the dates of the timeline would be adjusted and extended.  JSP reasonably relied upon Defendants' representations and promises, as set forth above.  Among other things, JSP has submitted amended site plan applications for the Project, executed an Amended and Restated Pledge Agreement, spent in excess of $55 million, and has otherwise acted to its detriment and to the benefit of Defendants.

263.     Defendants repudiated these repeated promises and representations by issuance of the Notice of Default on April 17, 2018, fifteen and one-half months after the January 1, 2017 date for the commencement of construction, which was the first time Defendants raised the issue.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.     Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.     Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the

redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.      Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.      Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.      Compensatory damages;

F.      Attorneys' fees and costs of suit; and

G.      Such other and further relief as the Court may deem equitable and just.

## FIFTH COUNT
**(Violations of Plaintiffs' Rights to Substantive Due Process,
Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988)**

264.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

265.    At all times relevant to this action, Plaintiffs have had, and continue to have, a protected constitutional interest in and to the contractual rights set forth in the complex Redevelopment Agreement, and the underlying property on which the Project is to be developed. Plaintiffs also have the right to be free from unlawful action by Defendants, who are acting under color of law with respect to the property rights of Plaintiffs.

266.    Based on the facts set forth above, Fulop, the Democratic Mayor of Jersey City, with malice and intent, began encouraging his appointees to the JCRA to issue the Notice of Default as a pretext for his motive of political animus against the sitting President of the United

States, Donald J. Trump, a Republican, and those closely associated with him, including Senior Advisor to the President, Jared Kushner.

267.    Defendants' actions are not related to a legitimate State interest, and are motivated by bias, bad faith and/or partisan political reasons and personal reasons unrelated to a proper governmental purpose and shock the conscience.

268.    This is far from a common planning dispute.  Like Bridgegate, this is a form of self-dealing for the benefit of the Mayor's own political aspirations.  Defendants' actions to retaliate against a redeveloper based solely upon political association at the expense of the public good and in violation of applicable Ordinances shocks the conscience.  Such conduct cannot be tolerated or condoned.

269.    In directing the JCRA and City employees to take the actions described above, Fulop was acting under color of State law at all relevant times.

270.    Defendants' actions violate Plaintiffs' right to substantive due process under the Fourteenth Amendment to the U.S. Constitution and Plaintiffs have been, and will continue to be, damaged by such actions.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.    Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.    Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.    Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.    Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.    Compensatory damages;

F.    Punitive damages;

G.    Plaintiffs' costs of suit, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §§ 1983 and 1988; and

H.    Such other and further relief as the Court may deem equitable and just.

### SIXTH COUNT
### (Violation of Plaintiffs' Right to Equal Protection,
### Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988)

271.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

272.    As set forth above, Defendants, acting under color of law, have violated Plaintiffs' constitutional rights by interfering with Plaintiffs' ability to develop the Project for improper political motives and by treating Plaintiffs differently from others similarly situated, both as to the application and procurement of the tax abatements and other quasi-governmental financing contemplated by the Redevelopment Agreement, and as to the extension of timetables set for performance under the Redevelopment Agreement.

273.    Plaintiffs own a protected property right in the Project as the redeveloper pursuant to the Redevelopment Agreement.

274.    Defendants have no rational basis for treating Plaintiffs differently from others similarly situated.  Defendant Fulop acknowledged that his motives were solely political and motivated by an intent of harming anyone close to the president of the United States.

275.    As set forth above, and based upon Fulop's public pronouncements and statements in the media, the motives causing him to treat Plaintiffs differently from those similarly situated derived from his personal political ambitions and desire to garner increased popularity by publicly and aggressively opposing the president and those closely associated with him, including Jared Kushner.

276.    Defendants' treated Plaintiffs differently from other developers by, among other things alleged above, advising Plaintiffs to withdraw their tax abatement applications for "political climate" reasons, Fulop failing to communicate any recommendation to the City Council regarding JSP's tax abatement application as required by Ordinance, abruptly terminating discussions on an Amended and Restated Redevelopment Agreement at the eleventh hour following months of negotiation, issuing a Notice of Default ten months prior to an actual default, and defaulting a redeveloper that had obtained all governmental approvals for construction.

277.    Defendants' equal protection violations were motivated by the Kushners' affiliation with the Trump Administration.

278.    Defendants' exhibited a pattern of antagonistic behavior against JSP and the Kushners throughout 2017 and 2018 following Jared Kushner's White House appointment that culminated in the JCRA's issuance of the Notice of Default, which effectively terminated the Project.  For example, the Mayor failed to make any recommendation to the City Council as required by Ordinance concerning any of Plaintiffs' tax abatement applications. The Mayor and

64

his City agents, including the Deputy Mayor, advised Plaintiffs to withdraw their tax abatement applications during the Mayor's election cycle for political reasons – not for any substantive or other deficiency in the applications themselves.  Despite extensive negotiations over the course of several months, the JCRA suddenly ceased all contact with JSP at the Mayor's direction just as the Amended and Restated Redevelopment Agreement was ready to be executed.  The Mayor and other City officials repeatedly Tweeted and made other public and private statements against the Kushners and the Project solely based on the Kushners' relationship to President Trump.  The JCRA issued the premature Notice of Default based on false deadlines that Defendants had previously assented to extending based on delays in obtaining various government approvals, among other things.  These actions, as well as the other actions alleged above, constitute a pattern of antagonistic acts of retaliation and political animus against Plaintiffs for exercising their First Amendment rights.

279.    In addition, Defendants' demeanor and conduct changed significantly following Plaintiffs' protected First Amendment conduct.  For example, the Mayor initially encouraged Plaintiffs to take over the Project from the prior redeveloper, promising to support tax abatements to further induce JSP to take on the Project.  However, following Jared Kushner's appointment to the White House staff in January 2017, the Mayor abandoned that support and instead initiated a campaign of very public pronouncements against Kushner Companies and JSP's involvement in the Project.  Other City officials followed suit, including the Deputy Mayor and members of the City Council, among others, who admitted that the Project was good for the City but that the Kushners' relationship with Trump now made it unsupportable.  The JCRA's position and demeanor also changed by suddenly abandoning the Amended and Restated

Redevelopment Agreement and  serving a sham  Notice of Default based on a false deadline that had yet to pass and that, in any event, had been extended by agreement between the parties.

280.    As set forth above, Defendants departed from ordinary procedures and normal protocols, instead using pretexts, such as the "election climate," and sham documents, such as the premature Notice of Default, under color of state law to terminate JSP from the Project by virtue of the Kushners' White House ties, which Fulop and other City officials viewed as detrimental to their own self-serving political aspirations.

281.    Defendants' actions were, and continue to be, irrational and wholly arbitrary.

282.    As such, Defendants' actions violate Plaintiffs' right to equal protection under the Fourteenth Amendment to the U.S. Constitution and under the Constitution of the State of New Jersey.

283.    As a direct and proximate result of Defendants' violation of JSP's constitutional rights, Plaintiffs have suffered substantial damages.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.    Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.    Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.    Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance

with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

        D.      Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

        E.      Compensatory damages;

        F.      Punitive damages;

        G.      Plaintiffs' costs of suit, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §§ 1983 and 1988; and

        H.      Such other and further relief as the Court may deem equitable and just.

**SEVENTH COUNT**
**(Violation of Plaintiffs' Right to Exercise Free Speech,**
**First Amendment to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988)**

284.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

285.    At all times relevant to this action, Plaintiffs have had and continue to have a protected constitutional interest in and to the contractual and property rights related to the Project.

286.    In connection therewith, Plaintiffs have a right to be free from unlawful action by Defendants, including any attempt to deprive Plaintiffs of the ability to exercise their free speech rights through participation in public discourse.

287.    Jared Kushner, former CEO of the Kushner Companies, is widely known to currently serve as senior advisor to the sitting president of the United States, Donald J. Trump.

288.    The activities of Jared Kushner constitutes protected political speech, including but not limited to his participation in public service for the Trump Administration.

289.    Defendants' engaged in a pattern of antagonistic behavior and political animus against JSP and the Kushners throughout 2017 and 2018 following Jared Kushner's White House appointment that culminated in the JCRA's issuance of the Notice of Default, which effectively terminated the Project.  By way of example, and without limitation, the Mayor failed to make any recommendation to the City Council as required by Ordinance and his own Executive Orders concerning any of Plaintiffs' tax abatement applications. The Mayor and his City agents, including the Deputy Mayor, advised Plaintiffs to delay their tax abatement applications during the Mayor's election cycle for political reasons – not for any substantive or other deficiency in the applications themselves.  Despite extensive negotiations over the course of several months, which led to certain agreements between the parties, the JCRA suddenly ceased all contact with JSP at the Mayor's direction just as the Amended and Restated Redevelopment Agreement was ready to be executed.  The Mayor and other City officials repeatedly Tweeted and made other public and private statements against the Kushners and the Project solely based on the Kushners' relationship to President Trump.  The JCRA issued the sham Notice of Default based on false deadlines that had not yet occurred and which, in any event, had previously been extended by the parties based on delays in obtaining various government approvals.  These actions, as well as the other actions alleged above, constitute a pattern of political animus and antagonistic acts of retaliation against Plaintiffs for exercising their First Amendment rights.

290.    In addition, Defendants' conduct and demeanor changed significantly following Plaintiffs' protected First Amendment activity.  For example, the Mayor initially encouraged Plaintiffs to take over as Designated Redeveloper of the Project, and promised to support tax abatements to further induce JSP to take on the Project.  However, following Jared Kushner's appointment to the White House staff in January 2017, the Mayor repudiated that support and

instead initiated a campaign of very public pronouncements against Kushner Companies and JSP's involvement in the Project. Other City officials followed suit, including the Deputy Mayor and members of the City Council, among others, who admitted that the Project was good for the City but that the Kushners' relationship with Trump now made it unsupportable. The JCRA's conduct and demeanor also changed by suddenly abandoning the Amended and Restated Redevelopment Agreement and prematurely serving the Notice of Default based on a false deadline it had previously assented to extending.

291.    As alleged above, Defendants departed from ordinary procedures and normal protocols using pretexts, such as the "election climate," and sham documents, such as the premature Notice of Default, under color of state law to effectively remove JSP from the Project by virtue of the Kushners' White House ties, which were motivated by political animus and viewed by Fulop and the City as detrimental to their own self-serving political aspirations.

292.    Defendants' actions in retaliating against Plaintiffs for exercise of free speech and political expression is sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights. The actions of Defendants have the effect of depriving Plaintiffs, and their beneficial owners, of the property rights in the Project.

293.    Defendants' actions against Plaintiff were motivated by Defendants' desire and intent to retaliate against Plaintiffs for exercise of the aforesaid First Amendment rights.

294.    Defendants' actions are not rationally related to a legitimate State interest and/or are motivated by bias, bad faith, and/or partisan political reasons and personal reasons unrelated to a proper governmental purpose.

295.    By Defendants' acts set forth above, they have violated Plaintiffs' right to be free from retaliation under 42 U.S.C. § 1983 and the First Amendment to the U.S. Constitution.

296. Defendants' actions in violating Plaintiffs' constitutional rights have caused Plaintiffs to suffer substantial damages.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A. Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B. Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C. Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D. Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E. Compensatory damages;

F. Punitive damages;

G. Plaintiffs' costs of suit, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §§ 1983 and 1988; and

H. Such other and further relief as the Court may deem equitable and just.

## EIGHTH COUNT
### (Violation of Plaintiffs' Right of Free Association,
### First Amendment to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988)

297.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

298.    Plaintiffs have the right to be free from unlawful action by Defendants, including attempts to deprive Plaintiffs of the ability to exercise their right of free association under the First Amendment of the U.S. Constitution.  Defendants, by their actions set forth above, deprived Plaintiffs of their First Amendment Rights of free association by engaging in a pattern of antagonistic behavior and retaliatory actions for the exercise of those rights.

299.    Defendants engaged in a pattern of antagonistic behavior and political animus against JSP and the Kushners throughout 2017 and 2018 following Jared Kushner's White House appointment that culminated in the JCRA's issuance of the Notice of Default, which effectively terminated the Project.  By way of example, and without limitation, the Mayor failed to make any recommendation to the City Council as required by Ordinance and his own Executive Orders concerning any of Plaintiffs' tax abatement applications. The Mayor and his City agents, including the Deputy Mayor, advised Plaintiffs to delay their tax abatement applications during the Mayor's election cycle for political reasons – not for any substantive or other deficiency in the applications themselves.  Despite extensive negotiations over the course of several months, which led to certain agreements between the parties, the JCRA suddenly ceased all contact with JSP at the Mayor's direction just as the Amended and Restated Redevelopment Agreement was ready to be executed.  The Mayor and other City officials repeatedly Tweeted and made other public and private statements against the Kushners and the Project solely based on the Kushners' relationship to President Trump.  The JCRA issued the sham Notice of Default based on false deadlines that had not yet occurred and which, in any event, had previously been extended by the

parties based on delays in obtaining various government approvals. These actions, as well as the other actions alleged above, constitute a pattern of political animus and antagonistic acts of retaliation against Plaintiffs for exercising their First Amendment rights.

300.    In addition, Defendants' demeanor changed significantly following Plaintiffs' protected First Amendment conduct. For example, the Mayor initially encouraged Plaintiffs to become involved with the Project, effectively promising to support tax abatements to further entice JSP to take on the Project by indicating that a failure to do so would constitute "blatant discrimination." Following Jared Kushner's appointment to the White House staff in January 2017, however, the Mayor abandoned that support and instead initiated a campaign of very public pronouncements against Kushner Companies and JSP's involvement in the Project. Other City officials followed suit, including the Deputy Mayor and members of the City Council, among others, who admitted that the Project was good for the City but that the Kushners' relationship with Trump now made it unsupportable. The JCRA's demeanor also changed by suddenly abandoning the Amended and Restated Redevelopment Agreement and prematurely serving the Notice of Default based on a false deadline it had previously assented to extending.

301.    As alleged above, Defendants departed from ordinary procedures and normal protocols using pretexts, such as the "election climate," and sham documents, such as the premature Notice of Default, under color of state law to effectively remove JSP from the Project by virtue of the Kushners' White House ties, which were motivated by political animus and viewed by Fulop and the City as detrimental to their own self-serving political aspirations.

302.    Defendants' actions in retaliating against Plaintiffs' exercise of free association rights are sufficient to deter a person of ordinary firmness from exercising such rights.

303.   Defendants' actions against Plaintiffs are based on their intent to retaliate against Plaintiffs for the exercise of their First Amendment rights, as set forth in detail above.

304.   In addition, Defendants' conduct and demeanor changed significantly following Plaintiffs' protected First Amendment conduct, as set forth above.  For example, although the Mayor initially encouraged Plaintiffs to pursue tax abatements in order to entice them to take on the project following MEPT, the Mayor very publicly reversed his position following Jared Kushner's appointment to the White House staff.

305.   Defendants' actions are not rationally related to a legitimate State interest and/or are motivated by bias, bad faith, and/or partisan political reasons or personal reasons unrelated to a proper governmental purpose.

306.   As a direct and proximate result of Defendants' violation of Plaintiffs' constitutional rights, Plaintiffs have suffered, and will continue to suffer, substantial damages.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.   Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.   Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.   Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the

Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

      D.    Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

      E.    Compensatory damages;

      F.    Punitive damages;

      G.    Plaintiffs' costs of suit, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §§ 1983 and 1988; and

      H.    Such other and further relief as the Court may deem equitable and just.

## NINTH COUNT
### (Violation of Procedural Due Process Rights,
### Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988)

307.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

308.    The Notice of Default was issued with the intention to deprive Plaintiffs of their property rights in the Project and did, in fact, deprive Plaintiffs of their property rights in the Project without due process of law.

309.    Despite reasonable efforts to obtain relief from the sham Notice of Default, Defendants have failed and refused to address any of the fundamental flaws in the Notice.

310.    Indeed, in light of the Notice of Default, Plaintiffs could not procure further financing for the Project to commence construction in order to cure the alleged default – even within the ten months that still remained pursuant to the Redevelopment Agreement's express terms. The City's refusal to communicate and/or withdraw the Notice of Default only made any effort to cure more futile.

311.    Defendants have violated 42 U.S.C. § 1983 and the due process clause of the U.S. Constitution affording procedural due process in depriving Plaintiffs of their property rights in the Project. Plaintiffs have been, and will continue to be, damaged by Defendants' violation of its due process rights.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.    Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

B.    Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

C.    Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

D.    Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

E.    Compensatory damages;

F.    Punitive damages;

G.    Plaintiffs' costs of suit, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §§ 1983 and 1988; and

H.     Such other and further relief as the Court may deem equitable and just.

## TENTH COUNT
### (Tortious Interference with Contract)

312.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

313.    JSP and the JCRA are parties to the Redevelopment Agreement.

314.    As set forth in the Redevelopment Agreement, the JCRA acted as an instrumentality of the City and acted on behalf of, and at the direction of, the City and its representatives at all relevant times with respect to the execution, amendment, and performance of the Redevelopment Agreement.

315.    Fulop and the City had knowledge of the Redevelopment Agreement between JSP and the JCRA at all relevant times.

316.    Fulop and the City nevertheless intentionally, maliciously, and without justification interfered with the contractual relationship between the JCRA and JSP by directing the JCRA to issue the Notice of Default on April 17, 2018.

317.    As discussed above, the alleged bases for the Notice of Default are utterly without merit, and the Notice of Default is little more than a transparent attempt by Defendants to interfere with and impair JSP's contractual and property rights in the Project, motivated by political animus.

318.    The actions of Fulop and the City have resulted in Defendants' breach of the Redevelopment Agreement.  Defendants' wrongful conduct includes, among other things, the following actions:

A.    Issuance of the frivolous Notice of Default contending that the timetables under the Redevelopment Agreement have not been met;

B.      After agreeing to adjust the construction timetable in Schedule C-1, failing to execute the Amended and Restated Redevelopment Agreement prepared to memorialize that agreement;

C.      Repudiating its obligation to cooperate with and facilitate the obtaining of tax abatements and other quasi-governmental financing required under the Redevelopment Agreement; and

D.      Making public statements conveying the false impression that JSP had not honored the Redevelopment Agreement, to the effect of interfering with JSP's financing and resulting in, among other things, JSP's lender serving a letter of default regarding a $57 million bridge loan.

319.    The actions of Defendants have delayed JSP's ability to move forward and complete the Project and have caused substantial damage.

320.    As a direct and proximate result of Fulop's and the City's interference with the Redevelopment Agreement between JSP and the JCRA, JSP has suffered damages in an amount currently estimated at $300 million, together with costs, expenses, and reasonable attorneys' fees.

321.    JSP's damages are based on, among other things, JSP's calculations of the amounts they have received or will receive had Fulop and the City not wrongfully and maliciously interfered with the parties' performance under the Redevelopment Agreement and had the JCRA not breached the Redevelopment Agreement.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

        A.      Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to terminate, declare a default, or otherwise interfere with or alter JSP's rights under the Redevelopment Agreement, as amended;

        B.      Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement;

        C.      Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1;

        D.      Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

        E.      Compensatory damages;

        F.      Punitive damages;

        G.      Attorneys' fees and costs of suit; and

        H.      Such other and further relief as the Court may deem equitable and just.

## ELEVENTH COUNT
### (Tortious Interference with Prospective Economic Advantage)

322.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

323.    During 2017, JSP and the JCRA discussed and agreed to amendments to the Redevelopment Agreement.

324.    During these negotiations, the JCRA acted as an instrumentality of the City and acted on behalf of, and at the direction of, the City and its representatives at all relevant times with respect to the amendment of the Redevelopment Agreement.

325.    JSP and the JCRA exchanged several draft amendments to the Redevelopment Agreement that included, among other things, agreed upon extensions to the construction timetable necessitated by events beyond JSP's control.

326.    The JCRA suggested that instead of an "amendment" to the Redevelopment Agreement, the parties should memorialize the agreed-upon revisions in the form of an "Amended and Restated Redevelopment Agreement," which JSP agreed to do.

327.    However, beginning on September 7, 2017, which was just two months before the city elections, the JCRA ceased communications with JSP regarding the Amended and Restated Redevelopment Agreement.

328.    The JCRA terminated further discussions with JSP at the request of the City and Fulop.

329.    Fulop and the City had knowledge of the draft amendments to the Redevelopment Agreement and the draft Amended and Restated Redevelopment Agreement implementing the agreement between JSP and the JCRA at all relevant times.

330.    Fulop and the City nevertheless wrongfully, intentionally, maliciously, and without justification interfered with the prospective economic relationship between JSP and the JCRA that would have resulted from the Amended and Restated Redevelopment Agreement and/or amendments to the Redevelopment Agreement.

331.    JSP possessed, and continues to possess, a reasonable expectation of economic advantage in the Project that may be impaired or lost as a direct result of the actions of the City and Fulop.

332.    If not for the City's and Fulop's unlawful and tortious actions, which were perpetrated without justification or lawful excuse, there is a reasonable likelihood based on the prior conduct of JSP and JCRA that JSP would have received the anticipated economic benefits of the Amended and Restated Redevelopment Agreement.

333.    The wrongful actions of Fulop and the City that tortiously interfered with the amendments to the Redevelopment Agreement and the Amended and Restated Redevelopment Agreement include, among other things, the following actions:

A.    Instructing the JCRA to issue the frivolous Notice of Default contending that the timetables under the Redevelopment Agreement have not been met;

B.    Instructing the JCRA to not further negotiate or execute the Amended and Restated Redevelopment Agreement after the JCRA had already agreed in principle to a good faith adjustment of timetables under the agreements; and

C.    Interfering with JSP's prospective economic advantage in the Project, including but not limited to preventing the reasonable extension of construction and other deadlines in the project and obstructing the award of tax abatements and other quasi-governmental financing for the Project through public statements and private communications with the JCRA.

334.    As a direct and proximate result of Fulop's and the City's interference with the anticipated Amended and Restated Redevelopment Agreement between JSP and the JCRA, JSP

has suffered damages in an amount currently estimated at $300 million, together with costs, expenses, and reasonable attorneys' fees.

335.  JSP's damages are based on, among other things, JSP's calculations of the amounts they would have received had Fulop and the City not wrongfully and maliciously interfered with the parties' performance under the Redevelopment Agreement and had the JCRA not breached the Redevelopment Agreement.

**WHEREFORE**, JSP demands judgment against Defendants for the following relief:

A.  Restraining Defendants, or any of their agents, servants, or employees, from taking any actions to interfere with JSP's and JCRA's negotiation and execution of the Amended and Restated Redevelopment Agreement;

B.  Restraining Defendants, or any of their agents, servants, or employees, from making any public statements or pronouncements that would undermine JSP's status as the redeveloper for the Project, or which would in any way impair or impede JSP's ability to obtain financing for the Project or to perform its obligations under the Redevelopment Agreement or an Amended and Restated Redevelopment Agreement;

C.  Ordering Defendants to specifically perform their obligations under the Redevelopment Agreement, including the extensions agreed upon by the parties in accordance with the expressly bargained-for right to such extension pursuant to the provisions of the Redevelopment Agreement as set forth above, including, but not limited to, §§ 2.10, 2.11, 3.01, 4.01(b), and 4.02, and Schedule C-1, as contemplated by the Amended and Restated Redevelopment Agreement;

D.  Declaring that the April 17, 2018 Notice of Default is a nullity and of no force and effect;

81

E.      Compensatory damages;

F.      Punitive damages;

G.      Attorneys' fees and costs of suit; and

H.      Such other and further relief as the Court may deem equitable and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by a jury in this action of all issues so triable.

Dated:  September 6, 2019                     SILLS CUMMIS & GROSS P.C.


By:  *Joseph B. Fiorenzo*
    Joseph B. Fiorenzo, Esq.
    David L. Cook, Esq.
    Stephen Klein, Esq.
One Riverfront Plaza
Newark, New Jersey 07102-5400
(973) 643-7000
jfiorenzo@sillscummis.com
dcook@sillscummis.com
sklein@sillscummis.com

*Attorneys for Plaintiffs*

**LOCAL CIVIL RULE 11.2 CERTIFICATION**

I, counsel of record for Plaintiffs in the above-referenced matter, hereby certify that the matter in controversy is not the subject of any other action pending in any court, or any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

SILLS CUMMIS & GROSS P.C.


By: *Joseph B. Fiorenzo*
    Joseph B. Fiorenzo, Esq.
One Riverfront Plaza
Newark, New Jersey 07102-5400
(973) 643-7000
jfiorenzo@sillscummis.com

*Attorneys for Plaintiffs*

Dated:  September 6, 2019

## CERTIFICATION OF NON-ARBITRABILITY
## PURSUANT TO LOCAL RULE 201.1(d)

I, counsel of record for Plaintiffs in the above-referenced matter, hereby certify that the relief requested in this matter includes non-monetary relief, and the damages potentially recoverable in this matter exceed the sum of $150,000, exclusive of interest and costs of any claim for punitive damages. Accordingly, Local Rule 201.1(d) does not apply to this matter.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

SILLS CUMMIS & GROSS P.C.


By: *Joseph B. Fiorenzo*
    Joseph B. Fiorenzo, Esq.
One Riverfront Plaza
Newark, New Jersey 07102-5400
(973) 643-7000
jfiorenzo@sillscummis.com

*Attorneys for Plaintiffs*

Dated:  September 6, 2019